Argued and submitted November 6, 1996, accused suspended for a period of one year November 28, 1997, reconsideration denied February 10, 1998

In re Complaint as to the Conduct of

# DAVID K. ALLEN,
*Accused.*

## (OSB 94-191; SC S41729)

949 P2d 710

Marc Blackman, of Ransom, Blackman & Maxfield, Portland, argued the cause and filed the briefs for the accused.

Jeffrey D. Sapiro, Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Graber, and Durham, Justices.

PER CURIAM

## PER CURIAM

The Oregon State Bar (the Bar) filed a disciplinary complaint against the accused, alleging that he had violated ORS 9.460(1) (requiring a lawyer to support the laws of this state), ORS 9.527(1) (commission of conduct that would justify denial of admission to the Bar), ORS 9.527(2) (conviction of a misdemeanor involving moral turpitude), DR 1-102(A)(1) (assisting another to violate disciplinary rules), DR 1-102-(A)(2) (committing a criminal act that reflects adversely on the lawyer's fitness to practice), and DR 1-102(A)(3) (engaging in conduct involving misrepresentation). A trial panel of the Disciplinary Board found that the accused had violated ORS 9.527(1) and DR 1-102(A)(2) and imposed a one-year suspension. This court reviews the record *de novo*. ORS 9.536(2) and (3); BR 10.1 and 10.6. The Bar has the burden of establishing the alleged misconduct by clear and convincing evidence. BR 5.2. We find that the accused violated ORS 9.527(1) and DR 1-102(A)(2), and we suspend him from the practice of law for a period of one year.

### I. FINDINGS OF FACT

We find the following facts. The accused was admitted to the Bar in 1981. He practiced primarily in the field of criminal law. In January 1994, the accused met Lewis at a tavern in Portland. Lewis was homeless, and the accused offered him shelter for the night at the accused's home. During the next few weeks, the accused encountered Lewis on several other occasions. He learned that Lewis had been hospitalized for hepatitis, was a heroin addict, and had been advised by doctors that continued drug use would be fatal. The accused often helped Lewis find shelter either at his home or elsewhere. On each of those occasions, the accused encouraged Lewis to enter a drug treatment program.

In February 1994, Lewis agreed to seek drug treatment and asked the accused to take him to a detoxification facility. The accused did so, but Lewis did not enter the facility. That night, Washington County police officers arrested Lewis for shoplifting. In March 1994, authorities transferred Lewis to jail in Portland, because a court in Multnomah

County had issued a warrant to arrest Lewis on other criminal charges.

The accused knew, from conversations with Lewis and Lewis' mother, that Lewis was deeply troubled, manipulative, and capable of violence. Lewis had failed to respond to psychiatric treatment in his youth and supported himself through petty crime and prostitution. He had had numerous contacts with the police as a juvenile due to his drug use and anti-social behavior, and also had a number of arrests and convictions as an adult. The accused viewed Lewis' incarceration as an opportunity to help Lewis seek drug treatment.

The accused sought out a court-approved drug treatment program that would accept Lewis. One facility, Alpha House in Gresham, agreed to screen Lewis to determine whether he was a candidate for treatment. The accused paid for the screening by Alpha House from his personal funds. Alpha House agreed to admit Lewis when a bed became available.

On March 4, 1994, Lewis pleaded guilty to a criminal charge pending in Multnomah County Circuit Court. The court suspended imposition of sentence, placed Lewis on two years' probation, ordered a drug evaluation, and authorized his release to an inpatient drug treatment program at a secure facility. As a condition of his probation, the court also required Lewis to obey all laws, to cease association with persons or places where drugs were manufactured, kept, sold, or distributed, and to submit to random drug testing.

The accused knew, in part from his previous professional experience, that, among other conditions of probation, the court had ordered Lewis to obey all laws, to refrain from any association with persons or places where illegal drugs are sold or used, and to obtain drug evaluation and treatment at a secure facility.

The Multnomah County Sheriff's Office administered Lewis' probation. However, no specific probation officer was assigned to Lewis.

On March 10, 1994, the accused learned from Alpha House that a bed was available for Lewis. Because no specific probation officer was assigned to Lewis, and neither Alpha

House nor the sheriff provided transportation, Lewis was responsible for providing his own transportation to Alpha House. The accused agreed to transport Lewis to Alpha House when Lewis was released.

On March 14, 1994, the accused arrived at the Multnomah County Justice Center in Portland at about 4:30 p.m. to pick up Lewis. He learned that Lewis had been delayed at another detention facility and would arrive in Portland at about 7:30 p.m. The accused called Alpha House to advise that Lewis would be delayed. The accused was advised that Alpha House preferred that Lewis arrive by 9:00 p.m. and that, if he could not do so, Lewis should check in the next morning. The accused understood that, if Lewis was not released until later in the evening, Lewis could spend the night at the accused's house, and he could deliver Lewis to Alpha House the next morning. The accused also knew that Alpha House would test Lewis' urine upon his arrival to ensure that he had not used drugs recently.

At 8:28 p.m. that evening, the Multnomah County Sheriff released Lewis. The accused met Lewis at the jail and intended to transport him in his car to Alpha House as quickly as possible. When he reached the accused's car, Lewis said that he had used methamphetamine while in jail. Lewis resisted getting into the car and appeared to the accused as if he might run away. Lewis insisted that the accused take him to meet his drug dealer before he would go with the accused to Alpha House.

Because of Lewis' agitated state, the accused believed that the only way to maintain some control over Lewis was to get him into the car. The accused feared that, unless he got Lewis into the car, Lewis would flee and rob someone for drug money. The accused also knew that he would not be able to return Lewis physically to the jail. After several minutes of conversation, the accused convinced Lewis to get into the car.

The accused drove toward Alpha House, although he knew that it no longer was possible to arrive before 9:00 p.m. The accused tried to talk Lewis into entering the facility, but Lewis resisted the idea. Lewis' reasoning became more erratic, and his behavior became more difficult to control.

Lewis attempted several times to leave the car, both while it was stopped and while it was in motion. As they approached Alpha House, Lewis refused to enter the facility. Lewis told the accused that, if he took him to get drugs that night, Lewis would enter drug treatment in the morning. The accused knew that he could not force Lewis physically to enter Alpha House. At that point, the accused believed that Lewis was capable of explosive violence, was out of control, and was a danger to himself and others if he escaped into the community. The accused also believed that Lewis would make his way back to Portland and obtain drugs regardless of the accused's efforts to stop him. As a result, the accused concluded that agreeing to Lewis' demand was the least harmful alternative available to him.

The accused drove Lewis to Northwest Portland. Lewis left the car and attempted, unsuccessfully, to obtain heroin without money. Lewis returned and requested money. The accused gave Lewis $40 and waited while Lewis purchased heroin. The accused was afraid that Lewis was a threat to the public and that Lewis might harm him.

Heroin is a Schedule I controlled substance. 21 USC § 812(c) (Schedule I)(b)(10)(heroin). Lewis' act of possessing heroin was a Class B felony. ORS 475.992(4)(a).

Lewis reentered the car, and the accused drove to his home. Lewis injected himself with heroin in the accused's bathroom. When Lewis emerged, he appeared calm and said that he intended to enter drug treatment in the morning. The accused and Lewis went to sleep in separate rooms.

The next morning, the accused awoke and found Lewis dead. He promptly reported the death to the police and to Alpha House, and he fully cooperated with the subsequent investigation of the death by the Multnomah County Sheriff. The medical examiner determined that the cause of Lewis' death was a lethal overdose of heroin. The medical examiner found no trace of methamphetamine or other drugs in Lewis' body.

Authorities charged the accused with Attempted Possession of a Controlled Substance (Heroin) - a Schedule I Controlled Substance, which is a Class C felony. ORS

475.992(4)(a); ORS 161.405(2)(c).[1] He pleaded guilty to that charge, and the court entered a judgment of conviction on October 4, 1994. On November 1, 1995, the trial court reduced the accused's conviction from a felony to a misdemeanor, pursuant to ORS 161.705(1).[2] The accused provided a complete description of all events to the Bar on its request and cooperated with the Bar in the disciplinary process.

## II.   FIRST CAUSE—CRIMINAL CONVICTION

The Bar's first cause of complaint alleges that, by reason of the accused's felony conviction for attempted possession of a Schedule I controlled substance, he is subject to discipline under ORS 9.527(2) and 9.460(1). ORS 9.527(5) renders a lawyer subject to discipline for a willful violation of ORS 9.460(1).

ORS 9.460(1) provides:

"An attorney shall:

---

[1] ORS 475.992(4)(a) provides:

"It is unlawful for any person knowingly or intentionally to possess a controlled substance unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of professional practice, or except as otherwise authorized by ORS 475.005 to 475.285 and 475.940 to 475.995. Any person who violates this subsection with respect to:

"(a)  A controlled substance in Schedule I, is guilty of a Class B felony."

ORS 161.405(2)(c) provides:

"An attempt is a:

"\* \* \* \* \*

"(c)  Class C felony if the offense attempted is a Class B felony."

[2] ORS 161.705(1) provides:

"Notwithstanding ORS 161.525, the court may enter judgment of conviction for a Class A misdemeanor and make deposition accordingly when:

"(a)  A person is convicted of any Class C felony; or

"(b)  A person is convicted of a Class B felony pursuant to ORS 475.992(2)(a); or

"(c)  A person is convicted of the Class B felony of possession of marijuana pursuant to ORS 475.992(4)(a); or

"(d)  A person convicted of any of the felonies described in paragraphs (a) to (c) of this subsection, or of a Class A felony pursuant to ORS 166.720, has successfully completed a sentence of probation; and

"(e)  The court, considering the nature and circumstances of the crime and the history and character of the defendant, believes that it would be unduly harsh to sentence the defendant for a felony."

"(1) Support the Constitution and laws of the United States and of this state[.]"

ORS 9.527 provides:

"The Supreme Court may disbar, suspend or reprimand a member of the bar whenever, upon proper proceedings for that purpose, it appears to the court that:

"(1) The member has committed an act or carried on a course of conduct of such nature that, if the member were applying for admission to the bar, the application should be denied;

"(2) *The member has been convicted in any jurisdiction of an offense which is a misdemeanor involving moral turpitude* or a felony *under the laws of this state*, or is punishable by death or imprisonment under the laws of the United States, *in any of which cases the record of the conviction shall be conclusive evidence*;

"(3) The member has willfully disobeyed an order of a court requiring the member to do or forbear an act connected with the legal profession;

"(4) The member is guilty of willful deceit or misconduct in the legal profession;

"(5) *The member is guilty of willful violation of any of the provisions of ORS 9.460* or 9.510;

"(6) The member is guilty of gross or repeated negligence or incompetence in the practice of law; or

"(7) The member has violated any of the provisions of the rules of professional conduct adopted pursuant to ORS 9.490." (Emphasis added.)

A. *ORS 9.527(2) (discipline for conviction of "misdemeanor involving moral turpitude").*

■   The accused was convicted of a felony on October 4, 1994. However, pursuant to ORS 161.705, the court reduced the felony conviction to a Class A misdemeanor and, on November 1, 1995, entered an amended judgment to that effect. The parties agree that, as a result of the entry of the

amended judgment before the decision of this court in the disciplinary proceeding, the Class A misdemeanor, not the felony, is the relevant crime of conviction in our analysis of the Bar's charge under ORS 9.527(2). That is correct. *See In re Sonderen*, 303 Or 129, 134, 734 P2d 348 (1987) (so holding in similar circumstances). As a consequence, the issue before the court is whether the accused is convicted of a "misdemeanor involving moral turpitude" within the meaning of ORS 9.527(2).

■　　　　The trial panel concluded that the accused's misdemeanor does not involve moral turpitude. It relied on *In re Chase*, 299 Or 391, 404, 702 P2d 1082 (1985), in which this court held that a conviction for a Class A misdemeanor of attempted possession of a Schedule II drug, cocaine, was not a crime involving moral turpitude under ORS 9.527(2). The Bar does not challenge the trial panel's conclusion regarding that charge or offer a principled basis for distinguishing *Chase*. We also conclude that the accused's misdemeanor conviction does not involve moral turpitude. Therefore, the accused did not violate ORS 9.527(2).

B.　*ORS 9.460(1) ("An attorney shall support the * * * laws * * * of this state").*

　　　　The Bar further alleged that the accused's criminal conviction violated the duty of lawyers under ORS 9.460(1) to "support the * * * laws" of this state. The trial panel found that, because he lacked the necessary mental state, the accused had not violated that statute. We agree with that conclusion, but for a different reason than that on which the trial panel relied.

　　　　The parties disagree regarding the applicability of ORS 9.460(1) to this case. The Bar argues that every criminal conviction violates the duty imposed by ORS 9.460(1), as long as the lawyer acts willfully in committing the underlying crime, as required by ORS 9.527(5). The accused argues that, because the sole factual predicate for discipline under the first cause is a *criminal conviction*, the court's source of authority to impose discipline is ORS 9.527(2), not ORS 9.460(1) and 9.527(5).

■ The parties' conflicting arguments raise an issue about the court's authority that our cases neither address nor decide.[3] Consequently, we must interpret the relevant statutes in context in order to discover the legislature's intention. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993) (describing methodology for statutory interpretation).

Some conclusions about the intended operation of ORS 9.527 result from a straightforward reading of its text. ORS 9.527 is a legislative authorization to this court to impose discipline on a member of the Bar for any one of a series of acts of misconduct or negligence. Only subsection (2) of that statute expressly addresses the imposition of discipline for conviction of a crime. Subsection (2), as relevant, authorizes the court to discipline lawyers for conviction of only two types of criminal offenses, *i.e.*, felonies and misdemeanors involving moral turpitude.[4] The legislature's choice to authorize the court to discipline lawyers for conviction of only those two categories of offenses serves as a limitation on that authority under the statute. Unless the lawyer's offense crosses the threshold of crime seriousness implicit in those two categories, subsection (2) does not authorize disciplinary action.

---

[3] Several decisions from this court have assumed, without deciding, that a lawyer is subject to discipline for a single criminal conviction under both ORS 9.527(2) and (5). *See In re Martin*, 308 Or 125, 127, 775 P2d 842 (1989) (conviction for bribery); *In re Hendricks*, 306 Or 574, 577, 761 P2d 519 (1988) (accused stipulated that his numerous serious crimes under the tax laws, involving fraud and dishonesty, were grounds for discipline under ORS 9.460(1) and 9.527(2) and (5), among others); *State v. Edmunson*, 103 Or 243, 248, 204 P 619 (1922) (accused convicted of "a number of misdemeanors involving moral turpitude"). Other decisions have imposed discipline under ORS 9.527(5) without addressing whether ORS 9.527(2) affects the analysis under subsection (5). *See In re McKechnie*, 214 Or 531, 533, 330 P2d 727 (1958) (no discussion of whether willful failure to file tax returns was a felony or a misdemeanor involving moral turpitude); *In re Means*, 207 Or 638, 640, 298 P2d 983 (1956) (conviction of misdemeanor with a " 'corrupt and criminal motive,' " citing federal case authority, is a violation of the duty to support the laws of the United States). Neither these cases, nor any others that we have discovered, discuss the effect of ORS 9.527(2) on the court's authority to impose discipline under ORS 9.527(5) for a conviction of a crime that is not a felony or a misdemeanor involving moral turpitude.

[4] Subsection (2) also authorizes discipline for an offense that is punishable by death or imprisonment under the laws of the United States. This case involves no claim that the accused was convicted of any federal offense. Accordingly, we do not consider the reference to federal criminal law in subsection (2).

The court may impose discipline, under subsection (2), only if the record contains competent evidence of the fact of a *conviction, i.e.,* an adjudication of guilt of a crime. Under subsection (2), once the Bar proves the predicate fact of a criminal conviction, all that remains is the legal determination whether the offense rises to the level of a felony or a misdemeanor involving moral turpitude under this state's laws. *See Chase,* 299 Or at 399 ("the category of misdemeanors involving moral turpitude is fixed with reference to the nature and elements of the crime and without consideration of the specific circumstances of a case").

By contrast to the clear intendment of subsection (2), the meaning of ORS 9.460(1) is uncertain. The text of ORS 9.460(1) does not define what conduct constitutes a failure to support the laws. A dictionary defines the term "support" as follows:

> "**2a**(1): to uphold by aid, countenance, or adherence: actively promote the interests or cause of * * * (2): to uphold or defend as valid, right, just, or authoritative: ADVOCATE * * * (3): to argue in favor of: vote for * * *; also; to advocate, endorse, vote for, or implement the policies, principles, or candidacy of * * * **b**(1): to provide means, force, or strength that is secondary to: back up * * * **c**(1): to serve as verification, corroboration, or substantiation * * * **3a**: to pay the costs of; MAINTAIN * * * **syn** SUSTAIN, PROP, BOLSTER, BUTTRESS, BRACE[.]" *Webster's Third New Int'l Dictionary* 2297 (unabridged ed 1993).

That broad definition lends some weight to the Bar's argument that, aside from whatever else the duty to support the laws may encompass, a conviction for violating a criminal law breaches that duty. But that is not the only plausible interpretation that the statute will bear.

We also reasonably may read the term "support," in this context, to require lawyers, in their professional capacity, to advocate for, to defend, and to endorse the state and federal constitutions and laws as society's chosen means for establishing justice. Under that reading, ORS 9.460(1) imposes on lawyers a general obligation of professional loyalty to the constitutions and laws, a duty that requires lawyers to refrain from willfully undermining or corrupting the

capacity of those laws to enforce legal rights and obligations. That view is bolstered by the dictionary definition quoted above and, to some degree, by the role of ORS 9.460(1) and 9.527(5) as the statutory basis for enforcing the lawyer's oath. *See* ORS 9.250, which obligates every successful applicant for bar membership, on admission, to

> "take an oath, administered as provided by Supreme Court rule, that in the practice of law the applicant will *support the Constitution and laws of the United States and of this state*, and be of faithful and honest demeanor in office." (Emphasis added.)

According to that view, ORS 9.460(1) is not designed specifically as a tool to impose discipline for a criminal conviction that falls below the threshold established in ORS 9.527(2).

The requirement in ORS 9.527(5) that the lawyer's violation of ORS 9.460(1) must be "willful" does not clarify what conduct constitutes a failure to support the laws. "Willfulness" is a description of a state of mind that can accompany misconduct. It is not a definition or specification of the action or behavior that constitutes the misconduct.

The foregoing discussion identifies the interpretive problem posed by ORS 9.460(1). We conclude, however, that this case does not oblige us to resolve it. The premise for the Bar's argument is the claim that ORS 9.460(1) and 9.527(5) authorize the court to impose discipline for a criminal conviction even though the crime does not rise to the threshold expressed in ORS 9.527(2), *i.e.*, a felony or a misdemeanor involving moral turpitude. In our view, that premise is flawed.

■ The problem with the Bar's approach is that the court cannot ignore the legislature's limitation in ORS 9.527(2) on the court's disciplinary authority over a criminal conviction. Assuming, without deciding, that ORS 9.460(1) relates to the court's disciplinary authority over a criminal conviction, it is more general than, and is inconsistent with, the restriction on the court's authority expressed in ORS 9.527(2). The legislature has indicated how this court should construe inconsistent statutes. ORS 174.020 provides:

"In the construction of a statute the intention of the legislature is to be pursued if possible; and when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent shall control a general one that is inconsistent with it."

Our cases that apply that principle indicate that the specific statute is considered to be an exception to the general statute. *See State ex rel Juv. Dept. v. M.T.*, 321 Or 419, 426, 899 P2d 1192 (1995) (applying that principle and citing other authorities). That rule of construction applies here. The particular intent reflected in the limitation in ORS 9.527(2) controls over any inconsistent general intent reflected in ORS 9.460(1) and 9.527(5).

As a consequence of the foregoing, we conclude that ORS 9.460(1) and 9.527(5) do not authorize discipline against the accused, on the basis of his criminal conviction because, as we concluded above, the relevant crime of conviction here is not a felony or a misdemeanor involving moral turpitude. The accused is not guilty of the Bar's charge under ORS 9.460(1) and 9.527(5).

We emphasize that our conclusion concerns the court's authority to discipline a lawyer for a criminal conviction. Lawyers remain subject to discipline for proven ethical misconduct even if a criminal prosecution for the same conduct results in an acquittal.

## III. SECOND CAUSE—ASSISTING ANOTHER TO PURCHASE HEROIN

The Bar's second cause of complaint alleges that the accused's conduct violated DR 1-102(A)(2) and ORS 9.527(1).[5]

---

[5] The trial panel concluded that the Bar did not prove by clear and convincing evidence that the accused violated DR 1-102(A)(1), which provides:

"It is professional misconduct for a lawyer to:

"(1) Violate these disciplinary rules, knowingly assist or induce another to do so, or do so through the acts of another[.]"

In rejecting this charge, the trial panel said:

"The accused did not induce or assist another lawyer in a violation of any Disciplinary Rule because Lewis was not a lawyer. Any assistance or inducement of Lewis did not result in any violation of a Disciplinary Rule by Lewis. Moreover, the accused did not violate a Disciplinary Rule *through* any act of

A. *DR 1-102(A)(2) (criminal acts that reflect adversely on fitness to practice).*

The trial panel found that the accused violated DR 1-102(A)(2), which provides that it is professional misconduct for a lawyer to "[c]ommit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law."

At the outset, the accused asserts that he cannot be guilty of a "criminal act" under DR 1-102(A)(2) if the court has no authority to discipline him under ORS 9.527(2) for a conviction based on the same conduct. In effect, he contends that the criteria of "fitness to practice law" under DR 1-102-(A)(2) and "moral turpitude" in ORS 9.527(2) are indistinguishable and that a misdemeanor that involves no moral turpitude also involves no adverse reflection on the misdemeanant's fitness to practice law. We reject that argument.

Under DR 1-102(A)(2), the court examines the accused's criminal act, not a criminal conviction, *In re Morin*, 319 Or 547, 559, 878 P2d 393 (1994), and whether that act reflects adversely on the lawyer's honesty, trustworthiness, or fitness to practice law, *In re Garvey*, 325 Or 34, 41, 932 P2d 549 (1997). Thus, for purposes of DR 1-102(A)(2), the lawyer's "criminal act" may barely resemble the crime of conviction that the court evaluates under ORS 9.527(2). Because the court may examine different acts of misconduct under the disciplinary rule and the statute, there is no necessary incongruity in the requirements that the court examine "fitness to practice law" under the rule, but "moral turpitude" under the statute. *See In re Leonhardt*, 324 Or 498, 506, 930 P2d 844 (1997) (illustrating separate analysis under statute and rule).

The charge under DR 1-102(A)(2) requires the court, as a first step, to determine what "criminal act" the accused

---

Lewis. The accused did not violate a Disciplinary Rule indirectly by using Lewis as an agent or instrumentality for doing something that would have been a violation of the Disciplinary Rules is [*sic*] done directly by the accused." (Emphasis in original.)

On review, the Bar did not dispute the trial panel's findings or conclusion. On *de novo* review, we also conclude, for the reasons expressed by the trial panel, that the accused did not violate DR 1-102(A)(1).

committed. In making that determination, the court may examine the characterization of the lawyer's crime set forth in an accusatory instrument, a plea agreement, a jury's verdict, or a judgment, although the court is not bound by the characterization in those sources. The court also may determine the nature of an accused's "criminal act," for purposes of the rule, by examining any evidence in the record that is relevant to that question.

■ In this case, the accused's criminal act in part consists of the crime reflected in the judgment of the criminal court, *i.e.*, attempted possession of a controlled substance (heroin), a Class A misdemeanor. However, the record also shows that the accused's criminal conduct consisted of furnishing transportation and money to Lewis in order to assist Lewis in his effort to obtain and possess heroin, a Class B felony. The accused's conduct in assisting Lewis in that act renders the accused criminally liable for Lewis' conduct. ORS 161.155 provides, in part:

"A person is criminally liable for the conduct of another person constituting a crime if:

"\* \* \* \* \*

"(2)   With the intent to promote or facilitate the commission of the crime the person:

"\* \* \* \* \*

"(b)   Aids or abets or agrees or attempts to aid or abet such other person in planning or committing the crime[.]"

Because the record demonstrates otherwise, we reject the accused's argument that his "criminal act," under DR 1-102-(A)(2), is the same crime for which he was convicted.

The rule next requires the court to determine whether the accused's criminal act "reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law." For the reasons that follow, we conclude that the accused's criminal act does reflect adversely on his fitness to practice law.

*In re White*, 311 Or 573, 589, 815 P2d 1257 (1991), sets forth the criteria that the court considers in deciding

whether a lawyer's criminal act reflects adversely on fitness to practice law:

> "Each case must be decided on its own facts. There must be some rational connection other than the criminality of the act between the conduct and the actor's fitness to practice law. Pertinent considerations include the lawyer's mental state; the extent to which the act demonstrates disrespect for the law or law enforcement; the presence or absence of a victim; the extent of actual or potential injury to a victim; and the presence or absence of a pattern of criminal conduct."

We address the pertinent considerations listed in *White* to decide whether the accused's criminal act bears a rational connection to his fitness to practice law.

The first consideration is the accused's mental state. We find that, in abetting Lewis' drug purchase, the accused acted intentionally, that is, with the conscious objective or purpose to accomplish a particular result. *See Leonhardt*, 324 Or at 509 (applying that definition of "intent"). The accused gave money to Lewis for the specific purpose of assisting Lewis to purchase heroin.

The accused asserts that he acted only negligently because he could not foresee the consequences of his criminal act. However, we are satisfied that, in giving money to Lewis for a drug purchase, the accused acted with the conscious objective to facilitate Lewis' illegal act. The "mental state" factor listed in *White* focuses on the mental state that accompanied the accused's criminal act, not the motivations or purposes that the lawyer sought to achieve by embarking on the criminal act. The accused may have feared Lewis, but Lewis did not coerce the accused into committing a criminal act. We find insufficient evidence in this record to conclude that the accused ever served as Lewis' lawyer. However, the fact that the accused's relationship with Lewis was personal, not professional, does not excuse the accused from professional responsibility under the Disciplinary Rules for intentionally engaging in a criminal act during the course of that relationship.

The accused's criminal act demonstrates substantial disrespect for the law. The accused aided and abetted Lewis

in committing a Class B felony. The accused's criminal act also demonstrates substantial disrespect for the administration of justice. The accused knew that the court had ordered Lewis, as a condition of probation, to refrain from illegal drug activity. Consequently, the accused's criminal act undermined an order of the court.

The accused concedes that Lewis was a victim of the accused's criminal act.[6] The extent of actual injury to Lewis from the criminal act was substantial. Lewis already was in ill health from his prior drug abuse. By facilitating Lewis' illegal purchase of heroin, the accused sharply increased the risk of greater adverse health consequences to Lewis from continued drug abuse. Moreover, the accused's criminal act virtually guaranteed that Alpha House would reject Lewis as a candidate for drug treatment, as ordered by the court, because his anticipated urinalysis test would show recent heroin use. Illegal drug use also exposed Lewis to a revocation of his probation.

Finally, Lewis died as a result of injecting himself with the heroin that he was able to purchase because of the accused's criminal act. Lewis' death from an overdose obviously was one potential risk of assisting Lewis' drug purchase. That risk was present when the accused gave money to Lewis. Consequently, the accused's criminal act entailed a substantial potential for injury to Lewis.

The trial panel concluded that the accused did not engage in a pattern of criminal conduct. The Bar accepts that characterization by the trial panel but argues that the accused still failed to take advantage of multiple opportunities to extract himself from the events that led to his criminal conduct. We, in turn, can accept the Bar's characterization of the facts but note that taking an extended period of time to commit one criminal act does not, *ipso facto*, turn the accused's single crime into a pattern of criminal conduct.

---

[6] The accused places heavy reliance on this court's decision in *In re Chase*, 299 Or 391, 402, 702 P2d 1082 (1985), in which this court held that an attempted possessory drug offense "does not involve harm to a specific victim." However, for purposes of our analysis under DR 1-102(A)(2), the accused's concession that Lewis was a victim of the accused's criminal act justifies a different analysis than that adopted in *Chase*.

Despite the absence of a pattern of criminal conduct, the record demonstrates that there is a rational connection, beyond the criminality of the accused's conduct, between that conduct and the accused's fitness to practice law. Therefore, we conclude that the accused violated DR 1-102(A)(2).

B.  *ORS 9.527(1) (Conduct justifying denial of admission to the Bar).*

The trial panel found that the accused had violated ORS 9.527(1), which authorizes discipline if a lawyer commits an act that, if the lawyer were applying to the Bar, would justify denial of admission. ORS 9.220 provides, in part:

"An applicant for admission as attorney must apply to the Supreme Court and show that the applicant:

"\* \* \* \* \*

"(2)(a)   Is a person of good moral character and fit to practice law.

"(b)   For purposes of this section \* \* \* the lack of 'good moral character' may be established by reference to acts \* \* \* which would cause a reasonable person to have substantial doubts about the individual's honesty, fairness and respect for the rights of others and for the laws of the state and the nation. The conduct or acts in question should be rationally connected to the applicant's fitness to practice law."

Fitness to practice, as defined by the Rules for Admission of Attorneys, means that:

"an applicant demonstrates a level of conduct, mental health, judgment, and diligence that will result in adequate representation of the best interests of clients, including participation in the legal process according to the Disciplinary Rules of the Oregon Code of Professional Responsibility." Rule 1.05(1).

The trial panel concluded that the accused lacked good moral character because his conduct would cause a reasonable person to have substantial doubts about his

respect for the laws of the state. The trial panel also concluded that the accused's conduct reflected adversely on his fitness to practice law.

On review, the accused acknowledges that he is subject to discipline under ORS 9.527(1). However, he asserts that he has demonstrated that, notwithstanding the events of March 14, 1995, he has good moral character, he currently is fit to practice law, his criminal conduct was an aberration, and the sanction imposed by the trial panel, *i.e.*, a one-year suspension, is excessive.

On the basis of the accused's concession, we conclude that the accused's conduct on March 14, 1995, violated ORS 9.527(1). We also conclude that the accused's remaining arguments address factors that may mitigate any sanction for that violation. We address those arguments below in connection with our discussion of sanction.[7]

## IV. SANCTION

This court has determined that the accused committed violations of DR 1-102(A)(2) and ORS 9.527(1). Thus, it is necessary to impose an appropriate sanction. We agree with the statement in the *American Bar Association Model Standards for Imposing Lawyer Sanctions* 1.1 (1991) (ABA Standards) that

> "The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely properly to discharge their professional duties to

---

[7] In a third cause of complaint, the Bar alleged that, in connection with Lewis' incarceration, release, and treatment, the accused represented himself to Multnomah County Corrections personnel, to staff at the drug treatment facility, and to Lewis' mother, either expressly or by implication, to be Lewis' lawyer. The Bar alleged that that conduct violated DR 1-102(A)(3), which provides:

"It is professional misconduct for a lawyer to:

"* * * * *

"(3) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]"

The trial panel found that the Bar did not prove by clear and convincing evidence that the accused, either expressly or by implication, represented himself to be Lewis' lawyer. On *de novo* review, we also find that the accused did not represent himself, either expressly or by implication, to be Lewis' lawyer. Therefore, we conclude that the accused did not violate DR 1-102(A)(3).

clients, the public, the legal system, and the legal profession."

*See In re Carstens*, 297 Or 155, 166, 683 P2d 992 (1984):

"Proceedings for the discipline of an attorney are not to punish the attorney for the commission of a crime. That matter is left to the criminal courts. The objects of the proceedings here are to uphold the dignity and respect of the profession, protect the courts, preserve the administration of justice and protect clients."

■ This court examines four factors in determining a disciplinary sanction: (1) the duty violated; (2) the lawyer's mental state; (3) the potential or actual injury caused by the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors. ABA Standard 3.0. We turn now to those factors.

A. *Duty violated.*

■ The accused breached his duty to the legal system by violating the criminal law and by aiding and abetting Lewis in obtaining illegal drugs. The accused also breached his duty to the public by assisting Lewis to engage in illegal conduct.

B. *Lawyer's mental state.*

As noted, the accused acted intentionally during the events of March 14, 1995.

C. *Potential or actual injury caused by the lawyer's misconduct.*

The accused's misconduct carried a great potential for injury to Lewis. That misconduct contributed to Lewis' death.

ABA Standard 5.1 provides:

"Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation:

"5.11 Disbarment is generally appropriate when:

"(a) a lawyer engages in serious criminal conduct, a necessary element of which includes * * * the sale, distribution or importation of controlled substances; * * *;

"* * * * *

"5.12 Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice."

In the light of that standard and our conclusions under the three factors analyzed above, the accused's conduct warrants a suspension. To determine whether that sanction is appropriate in this case, and what length of suspension may be necessary to protect the public, we consider aggravating and mitigating factors.

D. *Existence of aggravating or mitigating factors.*

We find two aggravating factors. First, Lewis was vulnerable. ABA Standard 9.22(h). Second, the accused had substantial experience in the practice of law. ABA Standard 9.22(i).

We find many mitigating factors. The accused has no prior disciplinary record. ABA Standard 9.32(a). The accused did not have a dishonest or selfish motive. ABA Standard 9.32(b). The accused testified that he was "personally invested" in Lewis' entry into drug treatment and became so stressed by the events of that evening that he was unable to think rationally about his course of action. We find that the accused had some personal or emotional problems on the night in question, although we also conclude, as noted above, that the accused acted intentionally in facilitating Lewis' drug purchase. ABA Standard 9.32(c). After discovering that Lewis was dead, the accused immediately notified the police. ABA Standard 9.32(d). The accused made a full disclosure of the relevant facts to the Bar and cooperated in these proceedings. ABA Standard 9.32(e). The accused has a good character and reputation, as shown by extensive evidence from judges, lawyers, and community organizations. ABA Standard 9.32(g). The accused had other penalties or sanctions

imposed by the criminal court for his misconduct. In addition, he voluntarily removed himself from the practice of law after the misconduct. ABA Standard 9.32(k). The accused has demonstrated remorse for his actions. ABA Standard 9.32(l).

In determining the correct sanction, the court also examines the conduct of the accused in light of the court's prior case law. *See Garvey*, 325 Or at 44 (so holding).

In *In re Clostermann*, 276 Or 261, 554 P2d 467 (1976), a circuit court entered an order that terminated the lawyer's custody over a ward. The lawyer violated the order. In imposing discipline on the lawyer, this court said:

> "[W]hen a court makes such an order, an attorney is not free to disregard it because he feels that the circumstances of the case make the order unwise; nor may he avoid the order, as the accused attempted to do here, by bringing a suit for a declaratory judgment. The accused's failure to comply with the court order violated ORS 9.480(3) [prohibiting a lawyer from willfully disobeying a court order requiring him to do or forbear an act connected with his profession]. He is hereby reprimanded for that violation." *Id.* at 265 (footnote omitted).

In this case, the accused knew of the court's order requiring Lewis to refrain from illegal drug activity. By supplying Lewis with money to purchase heroin, the accused undermined the court's order. We recognize that, unlike in *Clostermann*, the court's order here was not addressed to the accused, and did not require action by him in his professional capacity. Nonetheless, the principle discussed in *Clostermann* remains applicable here. The accused had a responsibility to refrain from undermining Lewis' compliance with the terms of a court order of which the accused had knowledge.

In *Carstens*, 297 Or at 166, this court found that the accused was guilty of a misdemeanor (*i.e.*, theft) involving moral turpitude. The lawyer had signed his wife's name falsely to a certification of title to personal property and sold some of the property. After examining extensive evidence of mitigating factors, this court said:

"Many lay and professional people testified before the Trial Board as to the accused's good character and reputation. We find that the act for which the accused was found guilty is unlikely to recur. We conclude that the public will be protected if the accused receives a public reprimand. It is so ordered.

"If we thought that there was any possibility that the accused would repeat this act or advise a client to do a similar act, we would not hesitate to disbar him." *Id.* at 167.

In *In re Mahr*, 276 Or 939, 556 P2d 1359 (1976), the accused, a new lawyer, was convicted of shoplifting, which is theft in the second degree, and reported the conviction to the Bar. This court concluded that the lawyer's conduct involved moral turpitude but was committed impulsively and was not premeditated. This court rejected a recommendation for a six-month suspension in favor of a 90-day suspension, stating:

"Under all of the circumstances, including the fact that the accused voluntarily reported his conviction to the Oregon State Bar and his apparently good reputation in the community, we believe that an appropriate penalty for petitioner's misconduct is that he be suspended from the practice of law for a period of 90 days, and for such further time until he makes a showing to this court that his conduct has been such during his period of suspension that he is entitled to be reinstated in the practice of law." *Id.* at 943.

In *In re Wolf*, 312 Or 655, 826 P2d 628 (1992), this court imposed a suspension of 18 months on a lawyer who provided alcohol and contributed to the sexual delinquency of a client who was a minor. The Bar argues that the accused's conduct here was analogous to that in *Wolf* and justifies an even longer suspension.

For several reasons, we do not agree that *Wolf* supports the Bar's position. *Wolf* involved a lawyer's misconduct in the context of an attorney-client relationship. In *Wolf*, the accused was convicted of multiple crimes, took advantage of his professional relationships with several persons (the minor and her parents) and, in doing so, acted for his own personal sexual gratification. In this case, the accused was convicted of one crime that involved no motive of personal gratification, and he abused no attorney-client relationships.

In *Wolf*, the accused bragged about his misdeeds, claimed that *he* was the victim of vindictiveness by the authorities, and was found by this court to lack candor during the disciplinary process. In this case, the accused has displayed none of those behaviors, has cooperated with the investigation by the Bar and police authorities, and has demonstrated his remorse. In *Wolf*, the aggravating factors outweighed the mitigating factors. In this case, the mitigating factors substantially outweigh the aggravating factors.

Despite those contrasting factors, the consequence of the accused's criminal behavior here—a death—is more serious than the consequence considered in *Wolf*. All things considered, we conclude that *Wolf* supports the imposition of a significant suspension here, as we discuss below.

None of the cases relied on by the parties closely resembles the facts of this case. However, this case shares some significant features of *Clostermann*, *Carstens*, and *Mahr*. The criminal conviction here, although more serious than that in *Mahr*, still involves no moral turpitude, as in *Carstens*. A reprimand is not appropriate here. We are satisfied, however, that a suspension requiring a formal application for reinstatement will protect the public adequately from the possibility of a repetition of the accused's misconduct. We also believe that our sanction, discussed below, will reinforce our view that lawyers may not undermine court orders or Oregon's drug laws with impunity.

The accused committed a serious criminal act on March 14, 1994. It carried a high risk of a tragic consequence that, in fact, occurred. We are satisfied from the record that the motive underlying the accused's misconduct was misguided, not selfish or malicious. He has never minimized his responsibility for the tragic events of March 14, 1994. The record convinces us that the accused's misconduct was an aberration that is inconsistent with his general good character and that similar misconduct is unlikely to recur. The accused cooperated with law enforcement authorities and the Bar in their investigations of Lewis' death, and he provided factual information that facilitated his own criminal prosecution and this disciplinary proceeding. *See In re Rowell*, 305 Or 584, 589, 754 P2d 905 (1988) ("Most of the evidence of

applicant's prior bad character was supplied by applicant's own statements and probably would not have been discovered if it were not for applicant's candor."). The accused has accepted his criminal responsibility, and he has demonstrated remorse for his misconduct.

In consideration of the factors that the court evaluates in selecting an appropriate sanction, as well as this court's prior case law, we conclude that the public will be protected adequately by the imposition of a suspension of the accused's privilege to practice law in Oregon for a period of one year.

The record indicates that, because he anticipated a disciplinary suspension, the accused removed himself, voluntarily and completely, from the practice of law for some period of time after March 14, 1994. At present, the court cannot make a finding from the record regarding the duration of that voluntary removal or whether it is still in effect. However, we will address briefly the question whether the accused is entitled to credit for any time spent in a voluntary withdrawal from the practice of law before the imposition of the disciplinary suspension here.

In addressing that issue, we bear in mind that, as stated above, the goal of lawyer discipline is to protect the public and the administration of justice. For at least two reasons, a lawyer's voluntary and complete cessation of the practice of law while awaiting imposition of professional discipline advances those objectives. First, such conduct ensures that the lawyer will not expose the public to the risk of additional injury or loss from professional misconduct during the pendency of disciplinary proceedings. Second, such conduct may be a tangible demonstration of remorse for unprofessional conduct. The latter reason is especially important because the lawyer's withdrawal from practice serves as a clear reminder to other lawyers of the necessity of constant adherence to professional standards of conduct.

The court will assess, on a case-by-case basis, whether a suspended lawyer may be eligible for credit for any time spent in a voluntary withdrawal from the practice of law. That assessment will take into account the nature of the misconduct, the factors that the court considers in selecting a

sanction, and whether allowing such credit is consistent with our main objective: the protection of the public and the administration of justice.

■   Under those criteria, we conclude that the accused is a candidate for such credit. Although no one factor is controlling, we rely particularly on the facts that the accused's misconduct is unlikely to recur, he has a good character and reputation as a lawyer, he has no prior disciplinary record, and he has shown genuine remorse. In order to qualify for such credit, the accused must demonstrate, in a formal application for reinstatement filed under BR 8.1(a), that he has complied with all requirements for reinstatement and, as a matter of fact, has refrained completely from the practice of law for not less than the required period of the disciplinary suspension.

The accused is suspended from the practice of law for one year, subject to any credit for which he may be eligible under the terms of this opinion, commencing on the effective date of this decision.