Submitted on record May 17, defendant suspended for
five years June 26, 1968

In re Complaint as to the Conduct of
# WILLIAM J. SUNDSTROM.
442 P. 2d 604

## PER CURIAM.

This is a disciplinary proceeding in which the Board of Governors of the Oregon State Bar has recommended that the accused's license to practice law be suspended for a period of two years and thereafter until it is reinstated pursuant to Rule 8.55 of the Rules for the Admission of Attorneys. Three members of the Board of Governors recommended that the suspension be for a period of one year.

The Trial Committee found the accused guilty of being unavailable to his clients and the public for a two month period (Opinion No. 130 of Opinions of the Oregon State Bar Committee on Legal Ethics), the issuance of insufficient funds bank checks, commingling of clients' funds with his own and the use of clients' funds for his own purposes, untruthful and

wilfully deceitful testimony before the Trial Committee and false representations made to an adverse party in pending litigation to that party's damage.

Upon review the Board of Governors found the accused guilty of the above misconduct except the charge of false representations to an adverse party. We concur with the findings of the Board of Governors. The complaint contained additional counts charging the drawing and issuance of insufficient funds bank checks with intent to defraud. Of these the accused was found not guilty by the Trial Committee because of a failure of proof of an intent to defraud. The Board of Governors concurred and we adopt that finding. *In re Kitchen,* 157 Or 32, 68 P2d 1068 (1937). The evidence reveals, however, the drawing of numerous insufficient funds checks by the accused.

During the period to which these charges relate Mr. Sundstrom maintained a law office in the Executive Building in Portland. From April 27 to June 24, 1966, he was generally unavailable to his clients and those members of the public who might have occasion to contact him on business matters relating to his profession. He had neither an office nor residence telephone. His office hours were erratic. Often his only visits to the office were in the evening. His secretary worked on a part-time basis and was frequently not in the office during normal business hours. On occasion a note was posted to the outer door of the office indicating he could be reached through the telephone of a neighbor; on other occasions no such message was posted. Mail ordinarily was received by his office but the Oregon State Bar failed in its attempts to have a certified letter delivered to him. To contact him was usually difficult and sometimes impossible.

However, his practice was quite limited. He testified that he had approximately ten clients. There is no evidence that his unavailability prejudiced the rights of any client. If this were the only charge against the accused, the discipline here ordered would be less severe.

Mr. Sundstrom represented a Mrs. Garen Francis in connection with a personal injury claim she had against an insured of Farmers Insurance Group. In the evening of May 6, 1966, he went to the home of Mr. and Mrs. Francis with a $2,000 draft from Farmers Insurance Group as a proposed settlement of Mrs. Francis's claim. The offer was accepted and the Francises executed a release and endorsed the draft. They wished immediate payment and the accused drew and delivered to them two checks from his office account representing the amount due them after deducting his contingent fee, the fee due him from previous legal services rendered to them and the amount of a medical bill owed by the Francises to a Dr. Dowsett. He agreed to pay this bill to the doctor on their behalf. Although he assured the Francises the checks were "good" he acknowledged in his testimony before the Trial Committee that he knew there were insufficient funds in his bank account to cover them. The Francises promptly cashed the checks at Meadows Pontiac and at a drug store. That same evening the accused cashed the draft at Portland Meadows racetrack. The management retained $650 as payment on a check drawn by the accused in that amount which had previously been returned to it by the bank because of insufficient funds in Mr. Sundstrom's account. The balance of $1,350 was paid in cash to the accused. Of this he placed $200 in his pocket for his own use. This left insufficient money to

cover the Francis checks and the Dr. Dowsett bill. He remained at the track and placed bets that evening.

In the week following May 6, the Francises learned that the checks negotiated at the drug store and Meadows Pontiac had been returned because of insufficient funds on deposit in Mr. Sundstrom's account. Mrs. Francis contacted Farmers Insurance Group and made complaint. A new draft was given to the Francises in the amount of $1,500. Farmers Insurance Group gave directions to stop payment on the original $2,000 draft, and, after a conference with the accused, gave him a draft for $500 representing his contingent fee on the settlement. On May 16, 1966, the accused picked up the checks from the drug store and Meadows Pontiac by paying cash therefor. By inadvertence the $2,000 draft was honored. Thus, Farmers Insurance Group had paid $4,000 on a $2,000 settlement. This was not discovered until October 1966, at which time the accused was sued for $2,000 by the insurance company. This law suit was settled by the parties for $500. The Francises have refused to repay any sum of money to the insurance company or Mr. Sundstrom. From all that appears in the record, the insurance company has suffered a loss of $1,500.

The accused issued checks to the Francises when he knew he did not have funds in the bank to cover them, he commingled clients' funds with his own, and converted to his own use funds belonging to his clients and Dr. Dowsett. He made no effort to deposit funds in his account to cover the Francis checks, although he knew they would be dishonored.

The accused was found guilty of giving untruthful and wilfully deceitful testimony before the Trial Committee. This arose from his testimony concerning the negotiation of the Farmers Insurance Group draft at

Portland Meadows. Mr. Sundstrom testified unequivocally that when he cashed the draft he placed approximately $1,800 in a sealed envelope and left it with Mrs. Medax, who was in charge of cashing checks at Portland Meadows, and that he placed the balance of the money in his pocket. He testified that upon leaving the premises he obtained the envelope from Mrs. Medax and took it to his home. He made no mention of a not sufficient funds check of his held by Portland Meadows. At the conclusion of testimony, the attorneys for the Oregon State Bar asked leave to continue the proceedings to obtain further evidence. When trial resumed the Bar produced Mrs. Medax as a witness. She testified that the racetrack management had been holding a not sufficient funds check previously drawn by the accused in the amount of $650, that she cashed the draft by returning Mr. Sundstrom's check and paying him $1,350 in cash. She denied that any money was placed in an envelope or that she retained any money in an envelope for him. The accused admitted that her testimony may have been correct and the Trial Committee so found. Further, Mrs. Medax testified that between the two sessions of the trial the accused contacted her and said in effect that if she testified as above before the Trial Committee he might as well turn in his certificate (referring to his right to practice law). The significance of the differing versions is that if Mr. Sundstrom had actually received approximately $1,800 and set it aside in an envelope, he would have had sufficient money to deposit in his account to cover the Francis checks and to pay Dr. Dowsett.

The Trial Committee permitted an amendment to the complaint charging the accused with giving wilfully false testimony before the Trial Committee.

*In re J. Kelly Farris,* 229 Or 209, 367 P2d 387 (1961). We adopt the guilty finding of the Trial Committee and the Board of Governors on this charge.

The accused is 35 years of age. He was admitted to the Bar in 1956, and since 1959 has been in practice as a sole practitioner in Portland. Before 1959 he had been briefly associated with a law firm, apparently as an associate. He has had no drinking problem. During the period involved herein he had marital problems and testified that this had been causing him distress.

The misappropriation of clients' funds and testifying falsely under oath are among the most serious charges that can be made against a member of the legal profession. Were he an applicant for admission to the Bar it could not be said that he has the requisite moral character and general fitness to practice law in this state. We are of the opinion that the two years' suspension recommended by the Board of Governors does not adequately reflect the gravity of the offenses of which the accused stands convicted. Permanent disbarment is justified, but a longer term of suspension may serve the same ends and yet leave to the accused the prospect that after rehabilitation he may be able to re-enter his profession.

Accordingly it will be the order of this Court that the accused is suspended from the practice of law in the State of Oregon for a period of five years, and thereafter, until he has made application for reinstatement and an affirmative showing, by evidence satisfactory to the Board of Governors and this Court, that he is in all respects again able and qualified, by good moral character and otherwise, to accept the obligations and faithfully perform the duties of an attorney in the State of Oregon, and that he has the

competency and learning in the law required for admission to practice law in the State of Oregon, and that his resumption of the practice of law in the State of Oregon will be neither detrimental to the integrity and standing of the Bar nor the administration of justice in this state, nor subversive to the public interest.

The Oregon State Bar is awarded judgment against the accused for its costs and disbursements.