Argued and submitted November 7, 2000, accused suspended for two years June 27, petition for reconsideration filed July 18 allowed by opinion November 22, 2002
See 335 Or 67 (2002)

In re Complaint as to the Conduct of

## JOHN P. DAVENPORT,
*Accused.*

(OSB 97-138; SC S47245)

49 P3d 91

Jeffrey D. Sapiro, Disciplinary Counsel, Lake Oswego, argued the cause and filed the request for review, briefs, and additional authorities for the Oregon State Bar.

Marc D. Blackman, Portland, argued the cause for the accused. With him on the brief and additional authorities was Ransom Blackman LLP, Portland.

Before Carson, Chief Justice, and Gillette, Durham, Leeson, and Riggs, Justices.*

PER CURIAM

Riggs, J., concurred in part and dissented in part, and filed an opinion.

---

* Van Hoomissen, J., retired December 31, 2000, and did not participate in the consideration or decision of this case; Kulongoski, J., resigned June 14, 2001, and did not participate in the decision of this case; De Muniz and Balmer, JJ., did not participate in the consideration or decision of this case.

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (the Bar) alleged that lawyer John P. Davenport (the accused) knowingly made several false statements under oath and repeatedly asserted the lawyer-client privilege when he knew that it did not apply, thereby violating Code of Professional Responsibility Disciplinary Rule (DR) 1-102(A)(3) (conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 7-102(A)(5) (knowingly making false statement of law or fact in representation of client); DR 1-102(A)(4) (conduct prejudicial to administration of justice); and DR 1-102(A)(2) (criminal act that reflects adversely on lawyer's honesty, trustworthiness, or fitness to practice law); as well as ORS 9.460(2) (conduct that misleads court by false statement of fact) and ORS 9.527(4) (Supreme Court may sanction lawyer for engaging in willful deceit). A trial panel of the Disciplinary Board concluded that the accused violated DR 1-102(A)(3), DR 7-102(A)(5), ORS 9.460(2), and DR 1-102(A)(4), but not ORS 9.527(4) or DR 1-102(A)(2), and suspended him from the practice of law for six months. The Bar seeks review, asking this court to conclude that the accused also violated ORS 9.527(4) and DR 1-102(A)(2), and to impose a greater sanction.

■■ We review the trial panel's decision *de novo*, ORS 9.536(3); BR 10.6; however, we ordinarily give weight to the trial panel's credibility findings, *In re Trukositz*, 312 Or 621, 629, 825 P2d 1369 (1992). The Bar has the burden of establishing the alleged misconduct by clear and convincing evidence. BR 5.2. "Clear and convincing evidence" means evidence establishing that the truth of the facts asserted is highly probable. *In re Johnson*, 300 Or 52, 55, 707 P2d 573 (1985) (internal quotation marks omitted). For the reasons that follow, we conclude that the Bar has met its burden respecting alleged violations of DR 1-102(A)(3), DR 7-102(A)(5), DR 1-102(A)(4), and DR 1-102(A)(2), and suspend the accused from the practice of law for two years.

### I. FACTS

The Bar's allegations are based solely upon responses that the accused gave, while under oath, during a

Federal Rule of Bankruptcy Procedure (FRBP) 2004 examination and a related civil deposition. We begin by setting out the relevant factual background.

For several years, the Professional Liability Fund (the PLF)[1] retained the accused and his firm to represent the PLF and its insureds in legal malpractice cases. Through the course of that representation, the accused employed a defense strategy for the PLF known as the "judgment acquisition strategy" (the acquisition strategy).[2] The acquisition strategy called for the PLF to become a judgment creditor of the malpractice plaintiff by purchasing an unpaid judgment against the plaintiff and then executing on the judgment against the malpractice claim, thereby forcing a sheriff's sale of that claim. At the sale, the PLF then would attempt to purchase the claim, and, if successful, the PLF would have control over both sides of the malpractice case. In that position, the PLF ideally could dismiss the plaintiff's case against its insured.

The PLF wanted to keep secret its involvement in the judgment purchases in such cases. Consequently, the acquisition strategy called for the PLF to purchase judgments in the name of a shell corporation or secret partner.

The accused first implemented the acquisition strategy for the PLF in 1991, in the Pranger matter. In that case, the accused, acting in the PLF's behalf, incorporated a shell corporation, Westview Investors, Inc. (Westview), and purchased an outstanding judgment against the plaintiff.[3] The accused was the incorporator and only officer, director, and shareholder of Westview. As such, he signed the articles of

---

[1] The PLF is a lawyers' professional liability insurance fund that the Bar established under ORS 9.080(2) and ORS 9.191(3).

[2] The PLF had used that strategy on at least one occasion that did not involve the accused. The PLF generally encouraged its outside counsel to use the strategy as one type of "creative solution" to malpractice claims.

[3] At the trial panel hearing, the accused testified that he originally had created Westview as a personal estate-planning entity. The accused testified that, "for some time," he had thought that Westview had been incorporated for that purpose. Although he still maintains that Westview initially was created for estate-planning purposes, he now admits that the timing of Westview's incorporation suggests that it actually was incorporated to implement the acquisition strategy in the Pranger matter.

incorporation, stock subscription, and state registration. Using Westview as a shell, the PLF ultimately was successful in "settling" the Pranger matter. In 1993, having no other need for Westview, the accused let its corporate registration lapse.

In July 1995, the PLF hired the accused to implement the acquisition strategy against a malpractice claim filed by two married couples, the Pearces and Woodfields (the plaintiff-debtors), against their bankruptcy lawyers and the lawyers' law firm (the defendants). The malpractice complaint alleged that the defendants' professional negligence had prevented the plaintiff-debtors from obtaining a full discharge through their Chapter 7 bankruptcies. The principal measure of damages was the total amount of debt that went undischarged.

At that time, the accused was the managing partner of his law firm. Because of his management duties, others in the firm performed much of the substantive work necessary to implement the acquisition strategy in the PLF's behalf on the Pearce and Woodfield matter. However, the accused maintained ultimate control over the case.

At the outset, the accused told the PLF that he was concerned that the plaintiff-debtors' lawyers might discover the acquisition strategy if the PLF again used Westview as the shell corporation. Nonetheless, with an impending trial date of August 23, 1995, the PLF needed to acquire the judgment quickly, and, with no other suitable corporation available, Westview was selected. Consequently, the accused instructed his staff to ascertain the corporate status of Westview and, if necessary, to reinstate it. The accused ultimately signed the reinstatement documents, which reflected that he still was the president and sole shareholder of Westview.

The accused next instructed a lawyer in his firm to locate and to list any valid outstanding judgments against the plaintiff-debtors. The accused reviewed that list and had the lawyer prepare a lengthy, detailed letter that outlined the relevant legal issues and recommended that the PLF, using Westview, purchase a 1987 Idaho judgment (the Wunsch judgment) that was registered in Union County,

Oregon. After reviewing the draft letter and making some changes, the accused signed the letter in July 1995 and sent it to the PLF.

The PLF agreed with the accused's recommendation and instructed the accused to negotiate a purchase of the Wunsch judgment. Using $85,000 that the PLF had provided, an associate in the accused's firm purchased an assignment of the judgment on August 2, 1995, and arranged to have Westview substituted as the named creditor. At that time, the accused was on vacation, and another partner in the firm oversaw the purchase. The accused, however, stayed in touch with the partner about the case.

With the malpractice trial a few weeks away, lawyers at the accused's firm immediately began efforts to execute on Westview's newly acquired judgment against the plaintiff-debtors' malpractice claim. Those efforts resulted in the scheduling of a sheriff's sale of the malpractice claim for August 21, 1995—two days before the malpractice trial date. The plaintiff-debtors responded by seeking an order from the bankruptcy court to enjoin Westview's collection activities and to prevent the sale. The accused appeared at a hearing on that motion as the lawyer for Westview.

On August 18, 1995, the bankruptcy court granted the plaintiff-debtors' motion to enjoin the sale and tentatively ruled that the malpractice claim was an asset of the plaintiff-debtors' bankruptcy estates. The court also reopened the bankruptcy estates, appointed a trustee for both estates, and appointed counsel for the trustee. The court ordered the trustee to obtain approval of further settlement offers from the plaintiff-debtors or their lawyers, unless otherwise ordered. The court also appointed Greene, who was representing the plaintiff-debtors in their malpractice case, as additional counsel to the trustee.

On the eve of the malpractice trial, the malpractice defendants and the plaintiff-debtors reached a tentative settlement agreement. That agreement required the plaintiff-debtors, with the trustee's assistance, to contact their creditors and negotiate a tentative settlement of all outstanding claims. After estimating the value of the remaining claims, the parties then would try to settle the malpractice case for

an amount close to that value. If a final settlement did not occur by spring, then, under the agreement, the malpractice trial would commence in April 1996.

In August and September 1995, the trustee issued notices to all the creditors, stating that the bankruptcy estates had been reopened and that creditors must file proofs of claim by December 1, 1995. The accused received such a notice and filed such a claim for Westview, totaling more than $99,500, in November 1995.

Sometime before January 1996, the trustee's counsel, together with the plaintiff-debtors' lawyers, began investigating Westview's claim to determine if they could limit its value or avoid it altogether. Initially, they thought that the claim might be invalid because the Wunsches had filed a seemingly duplicative claim against the bankruptcy estates. In addition, they had discovered that the accused was the president of Westview and thought that that fact might provide grounds to challenge the claim on the basis of illegality.[4]

On January 11, 1996, the lawyers for the plaintiff-debtors and the trustee collectively decided that the trustee's counsel would schedule an FRBP 2004 examination (the examination). On that date, those lawyers also discussed the possibility that the PLF somehow might be involved with Westview. At some point, the lawyers also decided that Greene, in his capacity as additional counsel to the trustee, would examine Westview's representative to obtain the information necessary to challenge Westview's claim. The trustee's counsel contacted the accused to schedule that examination and told the accused that the examination would address the validity of Westview's claim; however, he did not mention to the accused any specific theories in respect of challenging the judgment. The accused agreed to a January 26, 1996, examination date.

On January 26, 1996, the examination was held in the accused's office. The accused appeared at the

---

[4] Under Idaho law, it is a misdemeanor for a lawyer to purchase a debt, either directly or indirectly, solely with the intent to initiate a collection action. IC § 18-1003. Because the Wunsch judgment had originated in Idaho, the plaintiff-debtors' lawyers intended to use that statute to challenge Westview's ownership of the Wunsch claim.

examination as Westview's lawyer. Greene questioned the accused, under oath, about Westview's structure, ownership, and business activities. Greene also asked how and when Westview had learned about the Wunsch judgment, and when the accused first had learned about the malpractice claim.

The accused had spent little time preparing for the examination and was surprised that Greene, whom he knew to represent the plaintiff-debtors in their malpractice claim, was conducting the examination. The accused quickly became concerned that Greene's questions were leading to, and ultimately would uncover, the connection between the PLF and Westview.

At the beginning of the examination, the accused argued with Greene over the relevance of his questions. The accused also answered several questions by stating that he either did not know or could not remember the answers to questions without checking Westview's records. When told that he could take a moment to review documents to help him answer the questions, the accused refused to do so. The accused also claimed lawyer-client privilege in response to a number of questions about Westview's structure and business activities, and its purchase of the Wunsch judgment.[5]

Following the examination, the accused told the PLF that he thought that Greene's questions had been directed at discovering the PLF's connection to Westview, but that his responses had not disclosed the PLF's involvement. On February 19, 1996, the trustee's counsel filed a motion to compel the accused to answer the questions. In response, the PLF hired counsel to represent the accused. The accused's lawyers contacted the trustee's counsel and Greene, and requested that the motion be withdrawn in exchange for answers to the questions. The trustee's counsel and Greene agreed.

In February 1996, the accused's lawyers reviewed the examination transcript, searched Westview's files for answers to the questions concerning Westview, analyzed the

---

[5] As already noted, the accused's responses form the basis of the Bar's complaint against him. They are set out in detail later in this opinion.

accused's assertion of the lawyer-client privilege, consulted with the PLF on what to disclose, and ultimately recommended that the accused change 42 of his answers. The accused agreed and submitted a signed correction sheet on February 21, 1996. In one of his corrections, the accused indicated that he had had discussions with the PLF respecting the amount that Westview had paid for the Wunsch judgment.

The accused's changes prompted Greene to reconvene the examination on March 1, 1996. At that examination, the accused again claimed a lack of knowledge about some of the particulars respecting his awareness of the Pearce and Woodfield bankruptcy estates. However, his answers about other aspects of Westview's claim, as well as documentation that he had provided in response to a subpoena *duces tecum*, revealed the connection between the PLF and Westview, and details of the PLF's overall acquisition strategy. Following that examination, on March 6, 1996, Greene deposed the accused in connection with the malpractice action.[6]

In December 1996, Greene filed a complaint with the Bar, alleging, among other things, that the accused had engaged in ethical misconduct during the examination and the civil deposition.[7] Specifically, Greene claimed that the accused had been untruthful about his lack of knowledge and had misused the lawyer-client privilege to conceal the truth. In January 1998, following an investigation, the Bar filed a formal complaint; it later filed an amended complaint in August 1998.

In November 1999, after a hearing, the trial panel found that the accused knowingly had misrepresented the truth during the examination and, therefore, concluded that he had violated DR 1-102(A)(3), DR 7-102(A)(5), and ORS 9.460(2). In addition, the trial panel concluded that those

---

[6] Only one of the accused's statements in that deposition—discussed later in this opinion—is at issue here.

[7] We note that the accused's participation in the PLF's overall acquisition strategy is not at issue in this proceeding. Although Greene's complaint to the Bar also alleged that the lawyers involved with the acquisition strategy, including the accused, engaged in unethical conduct by employing that strategy, the Bar's complaint includes no allegations to that effect. We express no opinion respecting that issue.

misrepresentations, together with the accused's assertion of lawyer-client privilege, also violated DR 1-102(A)(4). However, the trial panel concluded that the accused did not violate ORS 9.527(4) because his actions were not willful. The trial panel also concluded that the accused did not violate DR 1-102(A)(2) because he corrected his misrepresentations within the time allowed by law and, in the trial panel's view, the misrepresentations at issue were not material to the examination. The trial panel concluded that the proper sanction was a six-month suspension.

The Bar petitioned for review and now asks this court to conclude that the accused also violated ORS 9.527(4) and DR 1-102(A)(2), and to impose a greater sanction. In response, the accused argues that he did not engage in misrepresentation, that he properly asserted the lawyer-client privilege, and that, therefore, he did not violate the rules as the Bar alleges. We address each alleged rule violation in turn.

## II. ANALYSIS

### A. *DR 1-102(A)(3)*

DR 1-102(A)(3) provides:

"It is professional misconduct for a lawyer to * * * [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]"

That rule embodies acts that involve any one of four distinct characteristics: dishonesty, fraud, deceit, or misrepresentation. *See In re Leonard,* 308 Or 560, 569, 784 P2d 95 (1989) (so explaining). Here, the Bar apparently proceeds under a theory of affirmative misrepresentation. *See In re Hiller,* 298 Or 526, 532, 694 P2d 540 (1985) (misrepresentation includes affirmative misstatement and intentional failure to disclose material facts).[8]

---

[8] After the Bar filed its formal complaint in this proceeding, this court noted that, when the Bar alleges a violation of DR 1-102(A)(3), the better practice is for the Bar to identify the theory or theories upon which it is proceeding. *In re Brandt / Griffin,* 331 Or 113, 138, 10 P3d 906 (2000). The Bar's amended complaint does not specify which of the four theories set out in DR 1-102(A)(3) the Bar intended to pursue in this proceeding. However, before this court, both the accused and the Bar argue only the theory of misrepresentation and only respecting the allegedly false

■ To violate DR 1-102(A)(3), an accused lawyer's misrepresentation, "whether direct or by omission, must be knowing, false, and material in the sense that the misrepresentation[ ] would or could significantly influence the hearer's decision-making process." *In re Eadie*, 333 Or 42, 53, 36 P3d 468 (2001). When considering whether a lawyer has made an affirmative misstatement, our inquiry focuses upon the truth or falsity of the facts asserted. *In re Huffman*, 331 Or 209, 216, 13 P3d 994 (2000).

The Bar contends that the accused made 21 affirmative misstatements during the examination and the civil deposition. Specifically, the Bar asserts that the accused made the following statements, knowing them to be false:

(1)     he was not an officer of Westview;

(2)     he did not know, without reviewing his file, whether he ever had been an officer of Westview;

(3)     he did not remember which officer of Westview he might have been;

(4)     he did not believe that he ever had been a shareholder of Westview;

(5)     he did not know, without checking his records, whether he ever had been a director of Westview;

(6)     he did not know whether Westview had lawyers other than his law firm;

(7)     he did not know, without checking his records, who were the directors of Westview;

(8)     he did not know, without checking his records, who were the officers of Westview;

(9)     he did not know, without checking his records, when Westview first was incorporated;

(10)    he did not remember being involved in the reinstatement of Westview as a corporation;

(11)    he did not know where Westview's principal place of business was located;

(12)    he did not know, without checking his records, whether he was an officer of Westview when he signed a proof of claim in the reopened bankruptcy

statements. Accordingly, we analyze the Bar's DR 1-102(A)(3) allegation under that theory only.

estates in Westview's behalf in or about November 1995;

(13) he did not know, without checking his records, whether he was a director of Westview in or about November 1995;

(14) he did not know how Westview had learned about the Wunsch judgment;

(15) he did not have any recollection of how he had learned about the Wunsch judgment;

(16) he did not know when he first had learned about the malpractice case;

(17) he did not know whether his law firm was a shareholder of Westview;

(18) he did not recall whether any spouse of any employee or lawyer in his law firm was a shareholder in Westview;

(19) he did not know how he had learned about the bankruptcy schedules in which the Wunsch judgment had been listed;

(20) he did not know who had told him that the plaintiff-debtors had filed bankruptcy; and

(21) he had not communicated with the lawyer who represented the malpractice defendants about the execution on the judgment.[9]

The accused contends that most of the responses that he gave were factually correct. The accused argues that, because he had thought that the examination would focus upon only the assignment of the Wunsch judgment, he had not reviewed Westview's corporate records and, therefore, honestly could not remember the exact details of Westview's ownership, management, or legal representation. He further asserts that other lawyers in his law firm had been in charge of Westview's reinstatement and other corporate work, and that he had not participated actively in implementing the acquisition strategy because he was the "big picture" person. In addition, the accused claims that, when he attended the

---

[9] The accused gave responses #1 to #18 at the January 26, 1996, examination; responses #19 and #20 at the March 1, 1996, continued examination; and response #21 at the March 6, 1996, civil deposition.

examination, he honestly thought that he originally had formed Westview to be an estate-planning vehicle and that his answers pertaining to its incorporation were consistent with that recollection. As such, he claims that his responses of "I don't know" or "I can't remember," and particularly those answers in which he spoke of a need to review certain records, were not misrepresentations.

The accused admits that he was the president of Westview at the time of the examination and that his response to the question respecting that matter was factually inaccurate. Nonetheless, the accused contends that, for the same reasons that he could not remember the information sought by the other questions, he honestly had not known that he was Westview's president at that time. The accused further contends that his response during the civil deposition denying any discussions with the lawyer representing the malpractice defendants was not a misrepresentation because it was factually correct.

■ The trial panel found that the accused's explanations for his responses at the examination were not credible. The trial panel concluded that the accused violated DR 1-102(A)(3) in his responses respecting: (1) his involvement in Westview's reinstatement; (2) Westview's location; (3) the manner in which Westview had learned about the Wunsch judgment; and (4) the manner in which the accused had learned about the Wunsch judgment. The trial panel did not make findings on the other alleged misrepresentations.

Having reviewed the record, and giving weight to the trial panel's credibility determinations, we adopt the trial panel's findings respecting those matters, with the exception of the accused's answer respecting Westview's location.[10] *See* BR 10.6 (after "consider[ing] each matter de novo upon the record," court may adopt any part of trial panel's decision). As the trial panel noted:

---

[10] As to the accused's answer respecting Westview's location, the record reflects that the accused elaborated on that answer by stating that he was unsure what was being asked, given the phrasing of the question. When Greene rephrased the question, the accused asserted the lawyer-client privilege.

"The accused was the architect of the asset acquisition strategy. He created Westview. He ordered its reinstatement in July 1995 and signed the reinstatement documents. He also discussed at that time with the PLF the risks of using Westview at all. The accused chose the judgment most appropriate to purchase. He reviewed and signed a letter to the PLF explaining what judgments were available and which was the most appropriate to purchase. The evidence shows the accused was very involved in using a strategy seldom employed * * * in an important case that came to him in a state of crisis from an important client. Significantly, the accused worried from the beginning about Westview being discovered for what it really was and he considered it very important that the identity of the PLF be kept secret in order for this expensive and risky strategy to succeed."

The accused's responses respecting Westview's reinstatement (response #10) and the manner in which Westview and he personally had discovered the Wunsch judgment (responses #14 and #15) violated DR 1-102(A)(3): The accused made those statements knowing that they were false, and those statements were material in that they could have influenced the decision-making process respecting the validity of Westview's claim in the plaintiff-debtors' bankruptcy estates. The foregoing further supports the conclusion that two more of the accused's statements, namely, that he did not know when he first had learned about the malpractice case (response #16) or how he had learned about the plaintiff-debtors' bankruptcy schedules (response #19), also violated DR 1-102(A)(3).[11]

██ As an additional defense to the Bar's charges under DR 1-102(A)(3), the accused argues that, even if some of his initial answers at the January 26, 1996, examination were false, he nonetheless did not violate DR 1-102(A)(3) because he corrected those responses within the time and in the manner provided by law under Federal Rule of Civil Procedure

---

[11] As to the Bar's remaining allegations, we conclude, after reviewing the record as a whole, that the Bar has failed to prove by clear and convincing evidence that those statements, in fact, were false (responses #9, #17, #18, and #21) or that the accused knew them to be false at the time that he made them (responses #1 to #8, #12, #13, and #20).

(FRCP) 30(e).[12] We disagree. In respect of those false answers that the accused corrected,[13] his corrections did not cure his initial misrepresentations. Regardless of the permissibility of transcript correction for litigation purposes, it does not matter under DR 1-102(A)(3) whether a lawyer later changes an affirmative misstatement if, when it was made, the lawyer knew that it was false. *See generally In re Wyllie*, 327 Or 175, 180, 957 P2d 1222 (1998) (rejecting lawyer's argument that later corrections "cured" earlier misrepresentation); *cf. In re Gustafson*, 327 Or 636, 649, 968 P2d 367 (1998) (once lawyer intentionally has failed to disclose material facts, when lawyer had those facts in mind, misrepresentation has occurred). The accused violated DR 1-102(A)(3).

## B. *DR 7-102(A)(5)*

DR 7-102(A)(5) provides, in part:

> "In the lawyer's representation of a client * * *, a lawyer shall not * * * [k]nowingly make a false statement of law or fact."

The primary difference between DR 7-102(A)(5) and DR 1-102(A)(3) is that the former requires, as applicable here, that the lawyer's false statement occur in the context of the lawyer's representation of a client. It is undisputed that the accused appeared at the examination in behalf of his client, the PLF. For the same reasons that we concluded that the accused violated DR 1-102(A)(3), we also conclude that the accused violated DR 7-102(A)(5).

---

[12] FRCP 30(e), applicable to bankruptcy proceedings through FRBP 7030, provides, in part:

> "If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them. * * *"

[13] The record reflects that the accused made corrections to all the false statements at the January 26, 1996, examination that we have concluded constituted misrepresentation under DR 1-102(A)(3). However, we also have concluded that the accused made an additional misrepresentation (respecting the plaintiff-debtors' bankruptcy schedules) at the continued March 1, 1996, examination, for which he offered no correction.

## C. *ORS 9.460(2) and ORS 9.527(4)*

In addition to the foregoing disciplinary rule violations, the Bar also charged the accused with violating ORS 9.460(2) and ORS 9.527(4), based upon his false statements. ORS 9.460(2) provides that a lawyer shall "[e]mploy, for the purpose of maintaining the causes confided to the [lawyer], such means only as are consistent with truth, and never seek to mislead the court or jury by any artifice or false statement of law or fact[.]" ORS 9.527(4) provides, in part, that "[t]he Supreme Court may disbar, suspend or reprimand a member of the bar whenever * * * it appears to the court that * * * [t]he member is guilty of willful deceit * * *."

In effect, ORS 9.460(2) and ORS 9.527(4) operate to prohibit lawyers from making false statements, similar to DR 1-102(A)(3) and DR 7-102(A)(5). Recently, this court observed that a determination that the same conduct has given rise to violations of both a disciplinary rule and an applicable statute "generally has not served to enhance the sanction that this court has imposed for the violation or violations of the Code of Professional Responsibility." *In re Kimmell*, 332 Or 480, 487, 31 P3d 414 (2001). Because the Bar bases its statutory allegations upon the same conduct that we already have concluded violated DR 1-102(A)(3) and DR 7-102(A)(5), and a decision respecting the accused's conduct as to those statutes would not alter the nature or extent of any sanction in this proceeding, we decline to address whether the accused's conduct violated either ORS 9.460(2) or ORS 9.527(4).

## D. *DR 1-102(A)(4)*

DR 1-102(A)(4) provides:

> "It is professional misconduct for a lawyer to * * * [e]ngage in conduct that is prejudicial to the administration of justice[.]"

In assessing an alleged violation of DR 1-102(A)(4), we first must determine "whether [the] accused lawyer engaged in 'conduct,' by doing something that the lawyer should not have done or by failing to do something that the lawyer was supposed to do." *Gustafson*, 327 Or at 643. Second, we must determine "whether that conduct occurred during the

'administration of justice.'" *Id.* Finally, we must consider "the 'prejudice' arising from the lawyer's conduct." *Id.*

The Bar alleges two violations of DR 1-102(A)(4). First, the Bar contends that the accused violated DR 1-102(A)(4) by making false statements. Second, the Bar contends that the accused violated DR 1-102(A)(4) by asserting the lawyer-client privilege when it did not apply. As explained below, because we agree with the Bar's first contention, we need not address its second contention.

As to the Bar's first contention, respecting false statements under oath, it is fundamental that a lawyer who is placed under oath to tell the truth has a duty to do so. *In re Reuben G. Lenske*, 269 Or 146, 168, 523 P2d 1262 (1974), *cert den* 420 US 908 (1975). False statements or misrepresentations made knowingly and in conjunction with a court proceeding violate DR 1-102(A)(4). *See Gustafson*, 327 Or at 652 (so demonstrating). We already have concluded, in the context of DR 1-102(A)(3), that the accused knowingly made several false statements. By making false statements under oath, the accused also violated DR 1-102(A)(4).

As to the Bar's second contention, respecting allegedly erroneous assertion of the lawyer-client privilege, we have determined that, in light of our conclusion that the accused violated DR 1-102(A)(4) by making false statements under oath, any discussion respecting erroneous assertion of lawyer-client privilege would not affect our determination of the appropriate sanction. Accordingly, we do not address that part of the Bar's argument under DR 1-102(A)(4).

E. *DR 1-102(A)(2)*

DR 1-102(A)(2) provides:

"It is professional misconduct for a lawyer to * * * [c]ommit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law[.]"

1. *Criminal Act*

A charge under DR 1-102(A)(2) first requires this court to determine "what 'criminal act' the accused committed." *In re Allen*, 326 Or 107, 120-21, 949 P2d 710 (1997). The Bar suggests that the accused's false statements constituted

the crimes of perjury under ORS 162.065 and false swearing under ORS 162.075, and the crimes of making a false oath or statement in a bankruptcy proceeding under 18 USC section 152, perjury under 18 USC section 1621, and making a false declaration ancillary to a court proceeding under 18 USC section 1623.

Although the Oregon statutes referred to above do not limit their application expressly to any certain proceeding, the United States Supreme Court has held that giving false testimony in a proceeding authorized by federal law is a crime against the United States and that state courts therefore cannot assume jurisdiction. *Caha v. United States*, 152 US 211, 215, 14 S Ct 513, 38 L Ed 415 (1894). Because the accused made his misrepresentations in a federal bankruptcy proceeding, we will not decide whether his conduct constituted a crime under Oregon law.[14]

Turning to the federal statutes that the Bar cites, all essentially require proof of a false, material statement in a covered proceeding. 18 USC §§ 1621, 152, 1623. The primary difference among the statutes, for our purposes here, is the requisite criminal intent. Perjury under 18 USC section 1621 requires proof of a *willfully* made false, material statement. *See Smith v. United States*, 392 F2d 169, 170 (5th Cir 1968) (willfulness is essential element of perjury under 18 USC section 1621). Similarly, the crime of making a false oath or statement in a bankruptcy proceeding under 18 USC section 152 requires proof of a *specific fraudulent* intent. *See United States v. Mathies,* 350 F2d 963, 967 (3rd Cir 1965) (essential element of 18 USC section 152 is that false oath be made with fraudulent intent). By contrast, the crime of making a false declaration under 18 USC section 1623 requires proof of only a *knowingly* made, false, material statement. *See United States v. Watson*, 623 F2d 1198, 1207 (7th Cir 1980) (so stating). After reviewing the record, we cannot say that the Bar has met the quantum of proof required under 18 USC sections 1621 or 152. We turn to an examination of the remaining criminal statute, 18 USC section 1623.

---

[14] The accused was under a state oath in the civil deposition. However, as noted above, we have concluded that the accused did not engage in misrepresentation during that deposition.

As noted, under 18 USC section 1623, it is a crime for any person, under oath, in any proceeding before or ancillary to any court of the United States, knowingly to make a false, material declaration.[15] The parties agree that the accused was under oath at the time of the conduct in question and that the examination qualifies as an ancillary proceeding. *Cf. U.S. v. McAfee*, 8 F3d 1010, 1013-14 (8th Cir 1993) (sworn civil deposition is ancillary proceeding for purposes of 18 USC section 1623). We already have concluded, in the context of DR 1-102(A)(3), that the accused knowingly made several false statements during the course of the examination. The remaining question is whether the accused's false statements were material, for purposes of 18 USC section 1623.

■ ■ Materiality has been interpreted rather broadly under 18 USC section 1623. A statement is material if it is related to any proper matter of inquiry. *United States v. Ostertag*, 671 F2d 262, 264 (8th Cir 1982). However, a statement cannot be considered material unless it is "capable of influencing the tribunal on the issue before it." *United States v. Bell*, 623 F2d 1132, 1134-35 (5th Cir 1980) (internal quotation marks omitted). In the context of a deposition or similar examination, the Ninth Circuit generally has concluded that a false declaration is material under 18 USC section 1623 if a truthful answer "is relevant to any subsidiary issue under consideration" and the false declaration had a "natural tendency to influence, or was capable of influencing," the decision-making body to which it was addressed. *See U.S. v. Clark*, 918 F2d 843, 846 (9th Cir 1990) (setting out that standard under 18 USC section 1621, for purposes of civil deposition), *overruled on other grounds by U.S. v. Keys*, 95 F3d 874 (9th Cir 1996); *United States v. Rahman*, Nos 91-10364, 91-10365, 91-10376, 91-10416, 1992, WL 363672 at *3 (9th Cir Dec 9 1992) (applying *Clark* to deposition for purposes of 18 USC section 1623).

---

[15] 18 USC section 1623 provides, in part:

"(a) Whoever under oath * * * in any proceeding before or ancillary to any court * * * of the United States knowingly makes any false material declaration * * * shall be fined under this title or imprisoned not more than five years, or both."

■   Here, the trial panel concluded that the accused's statements were not material to the examination. We disagree. As the Bar notes, the scope of an FRBP 2004 examination is broad and may relate "to any matter which may affect the administration of the debtor's estate." FRBP 2004(b). The accused's false statements responded to questions that were directed at determining: (1) whether Westview's proof of claim, which the accused had filed only two months before, was subject to challenge upon grounds of illegality; and (2) whether Westview had filed a duplicative proof of claim. Those matters were within the scope of the examination and were capable of influencing the decision-making process, because they had the potential of preventing the trustee's lawyers from ascertaining the validity of Westview's claim against the plaintiff-debtors' bankruptcy estates. Consequently, we conclude that the accused's knowing false statements were material to the examination.

■   The accused argues that, even if he is found knowingly to have made false, material declarations, he is protected by the recantation defense set out in 18 USC section 1623(d), which provides, in part:

> "Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section * * *."

According to the accused, under that provision, he did not commit a criminal act, because he corrected his testimony within the time allowed by law. The accused's argument fails, however, because 18 USC section 1623(d) expressly requires that the accused have "admit[ted] such declaration[s] to be false" at the time when he corrected his testimony. *See also U.S. v. Tobias*, 863 F2d 685, 689 (9th Cir 1988) (recantation requires unequivocal repudiation of prior testimony). Here, the accused consistently has maintained that he did not knowingly make false statements. That is not a recantation.[16] We therefore conclude that the accused engaged in a criminal act as defined by 18 USC section 1623.

---

[16] Even if 18 USC section 1623(d) did apply to those misstatements that the accused corrected, as already noted, the accused did not correct an additional misrepresentation that he made at the continued March 1, 1996, examination. Therefore, even if his corrections provided him with a defense, the accused nonetheless committed a criminal act under 18 USC section 1623.

## 2. *Fitness To Practice Law*

■■ Our next inquiry under DR 1-102(A)(2) is whether the accused's criminal act adversely reflects upon the accused's "fitness to practice law." "There must be some rational connection other than the criminality of the act between the conduct and the actor's fitness to practice law." *In re White*, 311 Or 573, 589, 815 P2d 1257 (1991). *White* identified a number of "[p]ertinent considerations" in determining whether a criminal act adversely reflects on a lawyer's fitness to practice law:

> "[T]he lawyer's mental state; the extent to which the act demonstrates disrespect for the law or law enforcement; the presence or absence of a victim; the extent of actual or potential injury to a victim; and the presence or absence of a pattern of criminal conduct."

*Id.* Applying those factors, the accused demonstrated a "disrespect for the law" when he knowingly made several false statements after taking an oath not to do so. In addition, the accused's misrepresentations under oath resulted in both potential injury to the legal system, by undermining the public's trust and confidence in lawyers, and actual injury to the plaintiff-debtors' bankruptcy estates, which were required to incur greater expense in conducting the follow-up examination. The accused's acts directly reflected upon his fitness to practice law. Therefore, we conclude that he violated DR 1-102(A)(2).

## F. *Summary*

In sum, we conclude that the accused engaged in misrepresentation on a number of occasions, in violation of DR 1-102(A)(3), and also violated DR 7-102(A)(5), DR 1-102(A)(4), and DR 1-102(A)(2). We now turn to the issue of sanction.

## III. SANCTION

This court follows a well-established methodology in determining the appropriate sanction for violations of the disciplinary rules. *See In re Wittemyer*, 328 Or 448, 459-61, 980 P2d 148 (1999) (preliminarily determining sanction after reviewing duty violated, mental state, and injury; noting that

sanction may be adjusted based upon aggravating and mitigating circumstances, and court's case law). Consistent with that methodology, we refer to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) and Oregon case law.

## A. *Duty Violated*

When the accused committed a criminal act that reflected adversely upon his fitness to practice law and engaged in conduct involving misrepresentation, he violated his duty to the public to maintain his personal integrity. ABA Standard 5.1. He also violated his duty to the legal system to refrain from making a false statement in connection with a court proceeding and engaging in conduct prejudicial to the administration of justice. ABA Standard 6.1

## B. *Mental State*

An act is intentional if it is engaged in with "the conscious objective or purpose to accomplish a particular result." ABA Standards at 7. For the reasons discussed earlier, we conclude that the accused acted intentionally respecting his misrepresentations.[17]

## C. *Injury Sustained*

"[A]n injury need not be actual, but only potential, in order to support the imposition of a sanction." *In re Williams*, 314 Or 530, 547, 840 P2d 1280 (1992). The accused's conduct caused both actual and potential injury. The accused's misrepresentations caused potential injury to the legal system. The public's confidence in the integrity of the law is undermined if lawyers reject its rules and application. *See generally In re Barber*, 322 Or 194, 212, 904 P2d 620 (1995) (lawyer who misled court and made false written statement caused potential injury to public confidence in legal profession). The

---

[17] As this court recently explained in *In re Flannery*, 334 Or 224, 231, 47 P3d 891 (2002), a determination that an accused lawyer acted "knowingly" for purposes of a particular rule violation does not preclude the conclusion that the lawyer acted "intentionally" for purposes of the sanction analysis. In this case, the record demonstrates that, in engaging in misrepresentation under oath, the accused acted with the "conscious objective or purpose," ABA Standards at 7, to conceal the connection between the PLF and Westview.

accused's conduct also caused actual injury to the plaintiff-debtors' bankruptcy estates. As noted, had he answered truthfully at the outset, the estates would not have incurred the additional time and expense of conducting the follow-up examination. However, we think it important to note that, by taking the opportunity—as he legally was permitted, but not required, to do for purposes of the examination—to correct all but one of his misstatements, the accused significantly reduced the injury to the legal system and the bankruptcy estates that otherwise might have flowed from his initial misrepresentations.[18]

### D. *Preliminary Determination of Sanction*

Under the foregoing considerations, the ABA Standards suggest that disbarment would be the appropriate sanction. *See* ABA Standard 5.11(a) (disbarment generally appropriate when lawyer engages in serious criminal conduct in which false swearing is necessary element). To decide the appropriate sanction here, we turn to the applicable aggravating and mitigating factors, and to this court's case law.

### E. *Aggravating and Mitigating Factors*

The Bar submits that several aggravating factors are present: dishonest motive, ABA Standard 9.22(b); a pattern of misconduct, ABA Standard 9.22(c); multiple offenses, ABA Standard 9.22(d); refusal to acknowledge the wrongful nature of the conduct, ABA Standard 9.22(g); and substantial experience in the practice of law, ABA Standard 9.22(i). We agree that the accused's conduct resulted in multiple rule violations and that the accused had substantial experience in the practice of law at the time of those violations. We also agree—contrary to the trial panel's conclusion—that the accused acted with a dishonest motive. Although the accused's motive was not selfish (in that he did not engage in misconduct for any personal gain), it was dishonest, because he acted to conceal the truth from opposing counsel. *See generally In re Dinerman*, 314 Or 308, 318, 840 P2d 50 (1992)

---

[18] We reiterate, however, that the fact that the accused legally was permitted to change his answers for purposes of the examination does not excuse his conduct respecting the charged violation of DR 1-102(A)(3).

(applying ABA Standard 9.22(b) when lawyer's actions in client's interest amounted to misrepresentations aimed at circumventing banking laws).

▮▮ We reject, however, the Bar's contention that the accused engaged in a pattern of misconduct. Although he made several misrepresentations, they were made in the same proceeding and pertained to the same subject. Additionally, although the accused consistently has maintained his factual innocence on those matters, we hold that his refusal to admit to the Bar's factual allegations is not an aggravating factor. *See generally The Florida Bar v. Corbin*, 701 So 2d 334, 337 n 2 (Fla 1997) (lawyer's claim of factual innocence could not be used against him as aggravating factor). To invoke ABA Standard 9.22(g), the Bar must point to some other evidence, aside from an accused lawyer's refusal to concede the Bar's factual allegations, to support a finding that the lawyer has refused to acknowledge the wrongful nature of his or her conduct. *See In re Devers*, 328 Or 230, 243, 974 P2d 191 (1999) (refusal to acknowledge wrongful nature of conduct evidenced by repetition of similar misconduct); *see also In the matter of Lemmons*, 545 SE 2d 885, 886 (Ga 2001) (same). Put differently: Every lawyer should have the opportunity to defend against accusations respecting his or her personal character and professional responsibility without reprisal for doing so.

In mitigation, we note that the accused has no previous record of discipline. ABA Standard 9.32(a). In addition, the Bar concedes that the accused cooperated in its investigation. ABA Standard 9.32(e).

F. *Case Law*

▮ We turn to consideration of this court's case law. This court considers false swearing under oath to be a serious violation:

> "Of all possible acts, few are so antagonistic to the business of judicial administration as the intentional false swearing which seeks to baffle the search for truth, without which justice is impossible. Such swearing is a flagrant insult to the dignity of the court."

*In re Moynihan*, 166 Or 200, 224, 111 P2d 96 (1941) (internal quotation marks and citations omitted). *See also In re William J. Sundstrom*, 250 Or 404, 409, 442 P2d 604 (1968) (falsely testifying under oath is among most serious charges that can be made against lawyer). Indeed, as discussed below, this court's case law demonstrates that disbarment or a lengthy suspension generally is appropriate when a lawyer intentionally or knowingly makes false statements under oath.

For example, in *Moynihan*, 166 Or 200, this court imposed a three-year suspension upon a lawyer who had offered false testimony in a foreclosure hearing instituted against his former clients and later had submitted an affidavit reiterating that testimony. The court concluded that the lawyer had acted knowingly and intentionally, and with intent to mislead and deceive the trial court. *Id.* at 220-21. The court further concluded the accused was guilty of "false swearing," which the court deemed "reprehensible." *Id.* at 224. The court tentatively concluded that disbarment might be appropriate, but ultimately imposed a three-year suspension, in light of the lawyer's lack of a disciplinary record and a three-year delay that had occurred in the proceedings below. *Id.* at 224-26.

Similarly, in *Sundstrom*, 250 Or 404, this court imposed a five-year suspension upon a lawyer who had offered false and willfully deceitful testimony before the trial committee in the Bar proceeding, in addition to commingling client funds and using those funds for his own purposes. In discussing the appropriate sanction, the court stated:

> "The misappropriation of clients' funds *and testifying falsely under oath are among the most serious charges that can be made against a member of the legal profession.* Were he an applicant for admission to the Bar it could not be said that he has the requisite moral character and general fitness to practice law in this state. We are of the opinion that the two years' suspension recommended by the Board of Governors does not adequately reflect the gravity of the offenses of which the accused stands convicted. *Permanent disbarment is justified,* but a longer term of suspension may

serve the same ends and yet leave to the accused the prospect that after rehabilitation he may be able to re-enter his profession."

*Id.* at 409 (emphasis added). *See also In re Walter E. Hutchinson*, 215 Or 36, 332 P2d 637 (1958) (disbarring lawyer who engaged in unprofessional misconduct by committing perjury, deemed to be misdemeanor involving moral turpitude).

More recently, in *In re Staar*, 324 Or 283, 924 P2d 308 (1996), this court imposed a two-year suspension upon a lawyer who, in addition to failing to cooperate with the Bar, engaged in misrepresentation and knowingly made false statements of fact under oath, resulting in prejudice to the administration of justice. In that case, the lawyer falsely had alleged under oath in a petition for a restraining order that she had been abused by a man with whom she had lived. In determining the appropriate sanction, the court noted that the lawyer's misconduct had caused actual and potential injury to the man named in the petition. *Id.* at 291. The court also found the existence of one aggravating factor (failure to cooperate) and two mitigating factors (absence of disciplinary record and presence of mental disability or impairment at the time of the misconduct). *Id.* at 291-92. The court emphasized that, had it not been for the accused lawyer's mental disability or impairment, the court would have disbarred her. *Id.* at 292. *See also In re Gustafson*, 333 Or 468, 41 P3d 1063 (2002) (disbarring lawyer who, among other violations arising from same course of conduct, knowingly made false statement of fact before tribunal and engaged in criminal act that adversely reflected upon fitness to practice; only aggravating factor of note was substantial experience in practice of law; no mitigating factors).

As can be seen from the foregoing, either disbarment or a lengthy suspension generally is appropriate in cases involving false statements under oath. We note that one relatively recent case, *Dinerman*, 314 Or 308, appears to depart from that pattern. The accused lawyer in *Dinerman* had participated in a scheme that his client and a bank manager had devised, whereby the lawyer had served as a "straw man" in taking out a bank loan in his client's behalf, thereby allowing

the client to circumvent federal loan limits and banking laws. The lawyer also had made a false statement on the loan application respecting ownership of the property offered for security for the loan. The court concluded that the lawyer had engaged in illegal conduct involving moral turpitude (citing federal banking laws), misrepresentation (both in seeking the loan and in misrepresenting ownership of certain property), and knowingly assisting his client in illegal or fraudulent conduct. *Id.* at 313-17. The court applied two aggravating factors (dishonest motive and, at least at one point, refusing to accept responsibility for the misconduct) and a number of mitigating factors (cooperative attitude, remorse, and good character and reputation). *Id.* at 318. The court also explained that 10 years had passed since the lawyer's misconduct and that the lawyer had had no additional disciplinary violations, which "reflect[ed] positively on his fitness to practice law." *Id.* at 319. The court ultimately imposed a 63-day suspension, citing other cases that involved misrepresentation or dishonest conduct. *Id.*

In our view, *Dinerman* is distinguishable from the facts here. First, and most significantly, although it involved misrepresentations and criminal conduct, *Dinerman* did not involve false swearing under oath; indeed, the court did not rely upon any case law involving false swearing in determining the appropriate sanction. Second, the court emphasized in *Dinerman* that the absence of any disciplinary violations on the lawyer's part during the 10-year delay in the proceedings positively reflected upon his fitness to practice. Finally, *Dinerman* involved a number of mitigating factors that appear to have outweighed the few aggravating factors.

## G. Appropriate Sanction

■   On balance, this proceeding most closely resembles *Moynihan*, which, together with most of the other case law discussed above, suggests that a lengthy suspension is in order here. We have concluded that the accused acted intentionally and with a dishonest motive, and that two additional aggravating factors, as well as two mitigating factors, apply. In *Moynihan*, the court similarly concluded that the accused lawyer had acted intentionally and dishonestly; the court also applied two mitigating factors. However, by contrast to

*Moynihan*, wherein the accused lawyer actively had reiterated his false testimony to a court, the accused here took steps to correct most of his false statements, for purposes of the bankruptcy proceedings, thereby significantly reducing the potential and actual injury that otherwise might have flowed from those statements. In light of that distinction, we conclude that a two-year suspension is appropriate in this proceeding.

The accused is suspended from the practice of law for two years, effective 60 days from the date of the filing of this decision.

**RIGGS, J.,** concurring in part and dissenting in part.

Although I agree with the majority's finding that the accused's conduct violated various disciplinary rules, I disagree with the sanction and would impose a six-month suspension, consistent with the trial panel's decision and recommendation.

It is worth observing that this case arises under somewhat unique circumstances in an atmosphere in which the PLF and the Bar find themselves subjected to extensive media coverage with heavy public criticism and a drumbeat for "corrective action." I write because I am troubled by what I consider to be a very peculiar and difficult role for lawyers who are counsel to the Professional Liability Fund (PLF) and because I believe the trial panel's sanction was supported by the record before us.

The majority opinion notes that the accused's participation in the acquisition strategy is not at issue in this proceeding. In the sense meant by the majority, that is true. But the relationship of the accused to the PLF and the situation the PLF finds itself in is the source of much of the mischief here. In fact, the PLF's acquisition strategy, used in the underlying transaction here, is a relatively common strategy among insurers. That strategy, distasteful and untidy as it seems in these circumstances, is nevertheless legal. Although the PLF was designed, in part, to provide a resource for the public to facilitate recovery for the mistakes of the practicing bar, it was and is, in effect, an *insurance company* that

receives mandatory premiums from Oregon lawyers. In that schizophrenic role, the PLF should be expected to serve its "policy holders" in a businesslike, if not fiduciary, fashion. Since PLF premiums largely are based on claims experience as a major factor of the cost of doing business, it follows that accepted and reasonable insurance defense strategies designed to preserve the fisc are appropriate. Because preserving the fisc occasionally may be at odds with the so-called "public responsibility" aspect of the PLF's functions, the PLF may be forced to choose, like some companies in the insurance marketplace sometimes do, to ignore a moral compass.

Here, what the accused did clearly was wrong. He is not a simple scapegoat. However, I read this record to suggest strongly that he was motivated exclusively by a desire to protect his client (the PLF) in carrying out an unfortunate, but legal, insurance defense strategy that depended on secrecy and stealth. The majority correctly points out that a dishonest motive can exist even when a motive of personal selfish gain is not present. Nonetheless, as the trial panel noted, personal selfish gain is absent here and, for me, when we consider sanctions, that is very significant.

The majority opinion accurately analyzes the accused's record as a bar member. He has no prior bar disciplinary history. Indeed, the record before us indicates nothing but years of honorable practice as a senior partner in a distinguished law firm. Moreover, as the Bar concedes, the accused cooperated fully with the Bar's investigation. With that history in mind, and in the context of the circumstances present here, I would accept the trial panel's sanction recommendation of a six-month suspension.

For those reasons, I respectfully concur with the majority opinion on guilt and dissent insofar as the majority's sanction is concerned.