Argued and submitted May 13, accused suspended from the practice of law for nine months September 26, 2002

# In re Complaint as to the Conduct of

## VIRGIL E. DUGGER,
*Accused.*

## (OSB 98-52, 00-65; SC S48634)

54 P3d 595

Thomas H. Tongue, Dunn Carney Allen Higgins & Tongue LLP, Portland, argued the cause and filed the brief for the accused. With him on the brief was Brenda K. Baumgart.

Jane E. Angus, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar. With her on the brief was John M. Junkin, Bullivant Houser Bailey PC, Bar Counsel, Portland.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged the accused with violating Code of Professional Responsibility Disciplinary Rule (DR) 1-102(A)(3) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1-102(A)(4) (engaging in conduct prejudicial to administration of justice); DR 5-101(A)(1) (continuing representation when professional judgment was or reasonably may have been affected by lawyer's own financial, business, property, or personal interests); DR 5-101(B) (prohibiting lawyer from preparing instrument giving lawyer or person related to lawyer significant gift from client); DR 7-102(A)(2) (knowingly advancing claim unwarranted under existing law); DR 7-110(B)(2) (communicating with judge about merits of case in writing without promptly delivering copy to opposing counsel or party); and DR 7-110(B)(3) (engaging in *ex parte* communication with court without notice to opposing counsel). A trial panel of the Disciplinary Board concluded that the accused had violated some, but not all, of those rules and suspended him from the practice of law for nine months.

■■ This court's review is automatic, Bar Rule of Procedure (BR) 10.1, and we review the decision of the trial panel *de novo*, ORS 9.536(3); BR 10.6. The Bar has the burden of establishing alleged misconduct by "clear and convincing evidence," BR 5.2, which means evidence establishing that the truth of the facts asserted is highly probable, *In re Johnson*, 300 Or 52, 55, 707 P2d 573 (1985). Although this court's review is *de novo*, we generally give weight to the trial panel's credibility findings. *In re Trukositz*, 312 Or 621, 629, 825 P2d 1369 (1992). For the reasons that follow, we conclude that the accused violated DR 1-102(A)(3), DR 1-102(A)(4), and DR 7-110(B)(2) and (3), and we conclude that the appropriate sanction is a nine-month suspension from the practice of law.

## I. FACTS AND DISCUSSION

The accused, a sole practitioner, was admitted to the Bar in 1962. His practice includes criminal defense, personal injury, domestic relations, probate, and bankruptcy. The

Bar's charges in this case stem from the accused's conduct in connection with the three matters described below.

## A. *Mantow Matter*

■ Mantow lived near the accused's office and began going to the accused's office to visit in the mid-1970s, probably because he and the accused had mutual friends. Mantow and the accused talked about gardening and books, and reminisced about other matters of common interest, such as World War II. Mantow and the accused sometimes went out for coffee, and Mantow occasionally brought flowers from his garden for the accused's office. The accused enjoyed visiting with Mantow, because Mantow was a "very interesting person" who remained interested in life. Because of his friendship with Mantow, the accused "would do just about anything for the old gentleman."

The accused did not represent Mantow in any legal matters until December 1987, when Mantow paid the accused $225 to start a file to investigate pursuing a claim on Mantow's behalf regarding an investment that Mantow had made in a company that had gone bankrupt. Mantow wrote additional checks to the accused between 1988 and 1992 for the accused's efforts to recover some of Mantow's investment in the bankrupt company.

During the time that the accused knew Mantow, Mantow became "paranoid" about people stealing from his bank accounts. Mantow believed that having a second signature on the accounts would make it more difficult for others to withdraw money from them. Mantow asked the accused to cosign on several of the accounts, and the accused did so.[1] The

---

[1] Mantow had eight savings or checking accounts and three safety deposit boxes. Only four of those accounts are at issue in this case. Photocopies of signature cards for those accounts were introduced into evidence at the hearing. However, only two of those accounts, one at Oregon Bank and one at First Interstate Bank, contain the accused's signature. Mantow and the accused signed the Oregon Bank card on August 3, 1983, and the card states that it was a joint account. The First Interstate Bank card, which the accused signed on January 14, 1988, does not indicate whether the account was joint or individual, but it contains a stamp stating "TWO SIGNATURES REQUIRED." Legal counsel at First Interstate Bank later determined that, because multiple signatures were required to withdraw funds from the account, withdrawing funds or closing the account after Mantow's death would require signatures of both the accused and the personal representative of Mantow's estate.

accused expressed concern to Mantow about the ramifications of having the accused's name on the accounts, and he told Mantow that Mantow should "look into it." The accused believed that Mantow had a lawyer, because Mantow had talked to the accused about his lawyer on various occasions. The accused also believed that Mantow had talked to bank personnel after the accused told Mantow that the accused was concerned about the ramifications of having the accused's signature on Mantow's accounts. The accused did not believe that he was entering into a business relationship with Mantow by signing the cards, and the accused did not believe that Mantow was well-off financially.

Mantow died on April 28, 1996. His will, which another lawyer, Holmes, had drafted in January 1988, left his entire estate to members of Mantow's family. Shortly after Mantow died, Vice, Mantow's nephew and the personal representative of Mantow's estate, went to the accused's office to talk to the accused. At that time, the accused learned that there was approximately $115,000 in Mantow's bank accounts.[2] During Vice's visit and thereafter, the accused maintained that he did not claim to be entitled to the money in the accounts and that he was concerned only about the ramifications of having his name on the signature cards.

Because Mantow's bank accounts had so much money in them, the accused decided that he needed legal advice from a probate lawyer. The accused called Cartwright, whose practice emphasizes probate matters. The accused followed up his telephone conversation with a letter to Cartwright on June 11, 1996. In that letter, the accused explained his relationship with Mantow and that Mantow had asked the accused to cosign on some bank accounts, and concluded by stating that the accused did "not know why [Mantow] set up the accounts as he did, and your thoughts on this situation will be greatly appreciated." The accused also told Cartwright that the accused was not interested in having the money in the accounts but that he did not know what Mantow had intended. Cartwright explained to the accused

---

[2] The amount in the accounts at issue in this proceeding was approximately $90,000.

that, under *former* ORS 708.616(1) (1995), *repealed by* Or Laws 1997, ch 631, § 567,[3] the accused "was now the owner" of any accounts in joint tenancy.

Two days later, on June 13, 1996, Vice's lawyer, Babka, wrote to the accused telling him that, if any of the accounts with Mantow had been "mistakenly set up as a joint account initially, then it is your ethical obligation to see that the funds go into the estate since you did not correct the error at the time the account was established." Babka's intent was to convince the accused to turn the funds over to Mantow's estate. Babka's letter also stated that, if the accused claimed any interest in any bank account that Mantow had owned, the accused should "file a claim against the estate immediately" so that the matter could be heard before a probate judge. Finally, Babka's letter stated that the accused had violated disciplinary rules concerning solicitation, legal employment, and fees for legal services in his meeting with Vice. The accused sent Babka's letter to Cartwright and wrote to Cartwright, in part:

> "I do not believe I have any claim against the estate; I only wish some clarification as to what my position is as to the accounts which [Mantow] set up, and included me in some way.
>
> "* * * * *
>
> "If an account or accounts were mistakenly set up, that fact is unknown to me, since [Mantow] set them up without my help or advice.
>
> "As I have stated before, I want to conduct myself and my office in the highest ethical way possible, and I do not appreciate Babka dictating my actions until I have more facts and know what the situation is to a greater extent than I now know."

---

[3] When the accused signed Mantow's bank cards, *former* ORS 708.616(1) provided, in part:

> "Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent, unless there is clear and convincing evidence of a different intention at the time the account is created."

Cartwright again told the accused that, by operation of law, legal title to the funds in the joint bank accounts had vested in the accused upon Mantow's death, that the accused could claim ownership and defend his position, that the accused could turn the funds over to Vice, or that Cartwright could try to find out what Mantow's intent had been in having the accused cosign on the accounts. The accused asked Cartwright to try to find out what Mantow's intent had been, because the accused was not willing to turn the funds over to the estate in the face of Babka's threats. Cartwright talked to Babka and to Holmes in an effort to obtain information about Mantow's intent when he asked the accused to cosign on the bank accounts.

On August 9, 1996, Vice, on behalf of Mantow's estate, filed a complaint against the accused in circuit court. The trial court subsequently determined that the matter should proceed in probate court. Three days later, on August 12, 1996, Cartwright, acting on the accused's behalf, filed a petition in probate court "For Determination of Rights to Bank Accounts." The petition alleged that the accused was a "party" as that term was defined in *former* ORS 708.600(6) (1995), *repealed by* Or Laws 1997, ch 631, § 567,[4] with present rights to four of Mantow's bank accounts held in joint tenancy with the accused. The accused's purpose in filing the petition was to have the court determine ownership of the funds. The accused had "no need or interest in [the] money," but he was concerned about the ethical, financial, and tax implications if he owned the funds as a matter of law.

To make clear that the accused was contending only that he was considered by law to be the owner of the accounts under *former* ORS 708.616(1), Cartwright "parroted the statute" in writing the petition. The petition asked the court to issue an order "determining the title to, rights in and ownership of the accounts."[5] Because the accused merely wanted

---

[4] *Former* ORS 708.600(6) provided, in part:

" 'Party' means a person who, by the terms of the account, has a present right, subject to request, to payment from a multiple-party account."

[5] Cartwright testified that he had ruled out filing an interpleader, because "[i]t's not an interpleader action. [The accused] is not a stakeholder, which would be an appropriate interpleader."

the judge to "tell him what to do," and not to treat the petition as an adversary matter, Cartwright did not file a trial memorandum.

Before the probate hearing began on the accused's petition, the judge called Cartwright and Fiorino, the estate's lawyer, into chambers. The judge asked whether anyone had reported the accused to the Bar because he had filed the petition, and she indicated to Cartwright and Fiorino that the accused should relinquish the accounts and settle the matter. The accused thereafter did so. Mantow's estate incurred more than $14,000 in legal fees before the matter was resolved.

In its first cause of complaint, the Bar alleged that, by claiming ownership of the accounts on which he had cosigned with Mantow, the accused violated DR 1-102(A)(3) and DR 7-102(A)(2). DR 1-102(A)(3) provides that "[i]t is professional misconduct for a lawyer to * * * [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" DR 7-102(A)(2) provides that "in representing the lawyer's own interests, a lawyer shall not * * * [k]nowingly advance a claim or defense that is unwarranted under existing law * * *." The trial panel found that the accused had violated both rules.

The Bar's complaint did not specify whether it relied on dishonesty, fraud, deceit, or misrepresentation in its charge under DR 1-102(A)(3). *See In re Brandt/Griffin*, 331 Or 113, 138, 10 P3d 906 (2000) (better practice is to identify theory or theories on which Bar proceeds under DR 1-102(A)(3)). However, in its trial memorandum, the Bar argued that the accused had engaged in dishonesty and misrepresentation by claiming ownership of the accounts. We confine our analysis to those two theories.

Dishonesty is conduct that indicates a disposition to lie, cheat, or defraud; untrustworthiness; or a lack of integrity. *See Hockett*, 303 Or 150, 158, 734 P2d 877 (1987) (so stating). A misrepresentation is a "false statement of a material fact or a nondisclosure of a material fact." *In re Starr*, 326 Or 328, 343, 952 P2d 1017 (1998). A fact is "material" if it could or would influence significantly the hearer's decision-making process. *In re Benett*, 331 Or 270, 277, 14 P3d 66

(2000) (quoting *In re Gustafson*, 327 Or 636, 649, 968 P2d 367 (1998)). To establish a violation of DR 1-102(A)(3), the Bar must present clear and convincing evidence that the accused lawyer's misrepresentations, whether direct or by omission, were knowing, false, and material. *In re Eadie*, 333 Or 42, 53, 36 P3d 468 (2001).

The Bar contends that the accused was dishonest and made a misrepresentation when he stated in the Petition for Determination of Rights to Bank Accounts that he was, in the Bar's word, "entitled" to the funds in Mantow's accounts. The accused responds that, by operation of law, he was the owner of the accounts and that his statements in the petition were accurate.

Under *former* ORS 708.616(1), which, as noted, was in effect when the accused filed the petition, sums remaining on deposit at the death of one of the parties to a joint account "belong to the surviving party * * * as against the estate of the decedent, unless there is clear and convincing evidence of a different intention at the time the account is created." The Bar does not dispute that, under the unambiguous wording of that statute, the accused became the owner of the funds in the joint accounts upon Mantow's death, unless clear and convincing evidence showed the contrary.

The Bar's argument, which the trial panel apparently found persuasive, is that, because the accused repeatedly had asserted that he had no claim against Mantow's estate, he was dishonest and made a misrepresentation by filing and pursuing a claim alleging that, under the statute, the funds were his. We disagree. Contrary to the Bar's assertion, the accused's petition did not state that he was "entitled" to the funds. Rather, it asked the court to "make a determination of the ownership" of the funds. From the outset, the accused told Cartwright that he was not claiming the funds and that he wanted to behave in an ethical manner. The record does not contain evidence that, by filing the petition, the accused had a disposition to lie, cheat, or defraud, or that the accused demonstrated untrustworthiness or lack of integrity. Neither is the statement in the petition that "sums remaining on deposit on the death of decedent belong to petitioner as against the estate of the decedent" a misrepresentation of a

material fact. The Bar has failed to prove by clear and convincing evidence that the accused violated DR 1-102(A)(3) in the manner that the Bar asserts.

■ The Bar also has failed to prove that, in filing the petition, the accused violated DR 7-102(A)(2). As we have explained, by operation of *former* ORS 708.616(1), upon Mantow's death, the accused became the owner of any sums that he held in joint tenancy with Mantow, unless clear and convincing evidence showed to the contrary. By asserting in the petition to the probate court that he was the owner of the funds under the statute, the accused did not advance a claim that was unwarranted under existing law.

■ In its second cause of complaint, the Bar alleged that the accused had violated DR 5-101(A)(1) and DR 5-101(B) in connection with the Mantow matter. DR 5-101(A)(1) provides, in part:

"Except with the consent of the lawyer's client after full disclosure,

"(1) a lawyer shall not accept or continue employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests."

DR 5-101(B) provides that "[a] lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer * * * any substantial gift from a client[.]" The trial panel concluded that the accused had not violated either of those rules.

The Bar argues that it was in the accused's personal or financial interest to maintain his relationship with Mantow and to continue to represent Mantow, "which required that [the accused] make full disclosure to Mantow and obtain his consent to the representation." Because the accused made no disclosure and provided no advice when he signed the bank cards, the Bar concludes, the accused violated DR 5-101(A)(1). Because the accused later claimed an interest in Mantow's accounts, the Bar argues that "it may therefore be argued that he prepared documents that gave him a substantial gift and violated DR 5-101(B)." The

accused responds that the Bar failed to present evidence that the accused had done work that could have been affected by co-ownership of bank accounts. Moreover, the accused argues, his judgment could not have been affected because, when he performed legal work for Mantow, he did not believe that Mantow had much money in his savings accounts.

The record contains no evidence that the accused's work for Mantow in the bankruptcy matter was or reasonably would be affected by co-owning the bank accounts. We agree with the trial panel that the Bar has failed to prove by clear and convincing evidence that the accused violated DR 5-101(A)(1).

■ We turn to DR 5-101(B). The trial panel concluded that, because the accused did not believe that he was receiving any substantial gift from Mantow when he signed the bank cards, the accused did not violate the prohibition in that rule. However, we need not decide whether DR 5-101(B) addresses a lawyer's subjective belief about the amount of a gift when the lawyer receives a gift from a client. That is so because the rule prohibits a lawyer from "preparing" an instrument that gives the lawyer a substantial gift from a client. Assuming without deciding that bank signature cards are legal instruments for purposes of DR 5-101(B), the record contains no evidence that the accused prepared the signature cards that gave him a joint interest in the bank accounts. Rather, Mantow obtained the cards from the bank and took them to the accused's office for the accused's signature. The Bar has failed to prove by clear and convincing evidence that the accused violated DR 5-101(B).

B. *Parrish Matter*

■ In 1998, the accused represented Joe and Laurel Parrish in a boundary dispute with a neighbor, Conner. The Parrishes asserted ownership by adverse possession of approximately 10 feet of property to which Conner also claimed ownership. Snyder represented Conner. On December 17, 1998, the accused wrote to Snyder that the accused was having a survey of the properties prepared, and he offered to settle the matter without going to trial. The letter also stated that the accused would send Snyder the results of the survey.

On January 13, 1999, the accused again wrote to Snyder, telling her that *Parrish et al. v. Conner* was set for daily call on January 29 and for trial on February 1, and that the accused was ready to try the case on February 1. The letter also stated, "If you intend to file an amended answer or request a reset, please do so, so I can arrange my schedule." The accused was anxious to have the matter resolved, because Joe Parrish, who was dying of cancer, did not want the dispute to be a burden on his wife after his death. Snyder did not file an appearance. According to the accused, he called Snyder sometime thereafter and left a message asking her if she wanted to have the trial date reset, but he received no response from Snyder, and they did not agree to have the trial set for a different date. According to Snyder, she talked to the accused by telephone after she received the January 13 letter and told the accused that her partner, Fowlks, would be trying the case. Snyder testified that she and the accused agreed that the trial would have to be postponed, because there had been no discovery yet and the property survey was not yet complete. Snyder also testified that she and the accused agreed that the accused would ask the court to postpone the trial, that she relied on their agreement and, accordingly, that she did not attend call on January 29. Neither the accused nor Snyder made notes of their conversation.

The accused appeared at call on January 29 and reported ready. He did not ask to have the trial set for a different date. Neither Snyder nor Fowlks appeared. On February 1, the accused, but not Fowlks, appeared for trial, and the accused asked the judge to contact Fowlks's office to determine why Fowlks was not present. The trial judge's clerk called Fowlks's office and talked to Snyder, who, in turn, called Fowlks at his dentist's office. Thereafter, both Snyder and Fowlks came to court to explain what had occurred. At that time, the accused handed Snyder the property survey. The judge rescheduled the case for trial and ordered Conner to pay "out of pocket costs" resulting from the delay of the trial.[6]

---

[6] The trial judge admonished Snyder and Fowlks for failing to file an appearance in the case and for failing to come to court to ask to reset the trial. Before the trial panel, Fowlks acknowledged that they probably should have filed a written appearance or appeared at call.

■■■■ In its third cause of complaint, the Bar alleged that the accused violated DR 1-102(A)(3) and DR 1-102(A)(4) in the Parrish matter. The text of DR 1-102(A)(3) appears above. DR 1-102(A)(4) provides that "[i]t is professional misconduct for a lawyer to * * * [e]ngage in conduct that is prejudicial to the administration of justice[.]" The focus of DR 1-102(A)(4) is on the effect of the lawyer's conduct on the administration of justice, not on what the lawyer intended. *In re Claussen*, 322 Or 466, 482, 909 P2d 862 (1996). A single act that is substantially harmful to the administration of justice violates DR 1-102(A)(4). *In re Haws*, 310 Or 741, 748, 801 P2d 818 (1990). Harm to the administration of justice can occur when either the substantive rights of a party to the proceedings or the procedural functioning of a case or hearing is impaired. *Id.* at 747. Potential harm to the administration of justice is sufficient to trigger application of DR 1-102(A)(4); the Bar need not prove actual harm. *In re Smith*, 316 Or 55, 59-60, 848 P2d 612 (1993).

The trial panel noted that neither the accused nor Snyder had "confirming letters, notes or any other tangible evidence to resolve this dispute." Based on its credibility assessment, it concluded that the accused had not violated either DR 1-102(A)(3) or (4) in the Parrish matter.

The Bar contends that the trial panel erred, because "inferences drawn from the evidence" support Snyder's account rather than the accused's and that Snyder's anger when she heard that the accused had not requested that the trial be reset is "telling." The accused responds that this court should adopt the trial panel's findings regarding this cause of complaint, because those findings were based on the panel's credibility determinations.

We disagree with the Bar that inferences that can be drawn from the evidence in the record rise to the level of clear and convincing evidence that the accused violated the disciplinary rules as charged. The trial panel's credibility findings regarding this cause of complaint deserve deference. *See Trukositz*, 312 Or at 629 (discussing when deference to trial panel credibility assessments is appropriate). The Bar has failed to prove by clear and convincing evidence that the

accused violated DR 1-102(A)(3) and DR 1-102(A)(4) in the Parrish matter.

## C. *Vu Matter*

The Parrishes prevailed at trial in their boundary dispute with Conner in *Parrish et al. v. Conner.* Thereafter, Conner retained Fowlks and Snyder to represent him in his plan to move a fence between Conner's property and property owned by his other neighbors, Vu and Nguyen. Like the Parrishes, Vu and Nguyen believed that they owned the disputed property by adverse possession. Conner went onto the disputed property on November 3, 1999, and began to cut down a tree that was in the way of where Conner planned to move the fence. According to Vu, when Boxberger, the tenant living on the Vu-Nguyen property, asked Conner to stop cutting the tree, Conner struck her and told her that he had a gun that he would use if Boxberger or anyone else tried to stop him. On November 4, 1999, Fowlks wrote a letter to Nguyen telling him that Conner intended to move the fence and that his attempt to do so had been met with hostility by Boxberger. On November 8, 1999, Fowlks wrote another letter to Nguyen, stating that Boxberger had threatened Conner with a firearm and that "any further threats will be met with police intervention." On November 11, 1999, Vu and Nguyen retained the accused to represent them, having learned from Laurel Parrish that the accused had represented the Parrishes in their dispute with Conner. Vu told the accused that Conner had called her several times about the disputed property.

On November 15, 1999, the accused filed a complaint on behalf of Vu and Nguyen to quiet title to the disputed property. The next day—13 days after the alleged altercation between Conner and Boxberger—and without notice to Conner or Conner's lawyer, the accused filed a motion for a preliminary injunction and restraining order against Conner. He did not consult the Oregon Rules of Civil Procedure before filing the motion.[7] Rather, he relied on his practice in seeking restraining orders in domestic relations matters. The accused appeared *ex parte* at the hearing on the

---

[7] ORCP 79 B(1) provides that a temporary restraining order may be granted without written or oral notice to the adverse party or that party's lawyer only if:

motion (November hearing), at which he submitted an affidavit from Vu that stated, in part, that the altercation between Conner and Boxberger had occurred on Wednesday, November 3, 1999, and that, since that time, Conner had been making "threatening phone calls" to Vu and Nguyen. The accused told the judge:

> "*There was some action over the weekend where the Defendant [Conner] came over with a gun*, pushed the tenant and caused injury and has continued to cut trees and bushes and tear down fences that have been in existence for forty years * * *. He is an elderly man and the police have been alerted and the Plaintiffs are in fear that he might follow through against their tenant or themselves."

(Emphasis added.) The following colloquy ensued:

"[Accused]: And I would ask that the amount of bail to be set just in case there is —

"[Judge]: The bond. All right. Have you contacted the Defendants to let them know, or their attorney?

"[Accused]: *There is no defense yet, Your Honor.*

"[Judge]: No, but —

"[Accused]: Yeah.

"[Judge]: *Have you told them you were going to make application for the order?*

"[Accused]: *I haven't discussed it with—with the old gentleman yet at all. It just came up and it is very serious.*"

(Emphasis added.) The judge signed the injunction and temporary restraining order preventing Conner from entering the disputed property and from contacting, harassing, harming, or otherwise interfering with Vu, Nguyen, or Boxberger.

---

"B(1)(a) It clearly appears from specific facts shown by affidavit or by a verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or the adverse party's attorney can be heard in opposition, and

"B(1)(b) The applicant or applicant's attorney submits an affidavit setting forth the efforts, if any, which have been made to notify defendant or defendant's attorney of the application * * *."

The order also provided: "It is further ordered that a security amount for a violation of any portion of this order be set in the amount of $1,000." The judge asked the accused if the accused was going to set a hearing, to which the accused responded: "I'll set a hearing now that the order is signed; I needed something immediately, Your Honor."

When Conner was served with the order, he informed Fowlks, who wrote to the accused on November 17, 1999. Fowlks told the accused that the accused's failure to provide notice to Conner or Fowlks before appearing *ex parte* the day before was "extraordinarily offensive" as well as "unethical and inappropriate," and that Fowlks immediately would file a motion to set aside the order. Fowlks did so and, on January 14, 2000, another judge held a hearing on the motion to set aside.

At that hearing, Fowlks called the accused as a witness, which took the accused by surprise. The accused had been in an automobile accident approximately a month before the hearing and felt somewhat confused. While the accused was under oath, Fowlks asked him a series of questions about what the accused had said at the November hearing. One of those questions was whether the judge who had presided at the November hearing had asked the accused if the accused had contacted Connor or Conner's lawyer before appearing *ex parte* at the hearing. The accused responded, "No." After the accused had testified about what he had said at the November hearing, the judge permitted Fowlks to play an audiotape of the November hearing. That tape made clear that the judge had asked the accused whether he had contacted Conner or Conner's lawyer. The judge at the January hearing then asked the accused whether there was anything he wanted to say while he still was under oath. The accused did not explain the disparity between his previous testimony and the audiotape of the November hearing. At the conclusion of the hearing, the judge set aside the restraining order and temporary injunction against Conner.[8]

---

[8] The judge gave the following reasons for setting aside the restraining order:

"1. Plaintiffs' failure to give prior notice to Defendant or his attorney of the Ex Parte appearance of Plaintiffs' attorney, which the Court finds to be a fatal defect procedurally;

In its fourth cause of complaint, the Bar alleged that the accused violated DR 1-102(A)(3) and DR 1-102(A)(4) by making misrepresentations to the court at both the November and January hearings, and that the accused violated DR 7-110(B)(2) and (3) by appearing *ex parte* at the November hearing without providing notice to Conner or to opposing counsel. The trial panel found that the accused's statement at the November hearing that "[t]here is no defense yet" was a misrepresentation and that his denial at the January hearing that he had made that statement in November also was a misrepresentation. The trial panel concluded that the misrepresentations violated DR 1-102(A)(3) and that they were prejudicial to the administration of justice, in violation of DR 1-102(A)(4). The trial panel also concluded that the accused's *ex parte* appearance at the November hearing without giving prior notice to the other side violated DR 7-110(B)(2) and (3).

We begin with the alleged violations of DR 1-102(A)(3) and (4), the texts of which appear earlier in this opinion. The Bar contends that the accused misled the judge at the November hearing about whether Conner was represented by counsel and when the altercation between Conner and Boxberger had occurred. The Bar also contends that the accused made misrepresentations under oath during the January hearing regarding his exchanges with the judge at the November hearing. The accused responds, first, that the Bar should not be permitted to "bootstrap" the alleged offenses in the Vu matter by charging him twice for essentially the same conduct. With respect to the accused's conduct at the November hearing, he contends that the evidence does not demonstrate that he committed any ethical violations.

We reject the accused's contention that the Bar's charges in the Vu matter involve "bootstrapping." The complaint alleges that the accused made misrepresentations to two different judges in two different proceedings. The factual predicates for the Bar's charges in the two proceedings are different, as we discuss in more detail below.

"2. Misrepresentation of Plaintiffs' counsel to the presiding Court;

"3. Failure to submit an Affidavit to substantiate the Plaintiffs' position without relying on hearsay; and

"4. Failure of Plaintiffs' counsel to schedule an immediate hearing by way of an Order to Show Cause as instructed by the presiding Judge."

## 1. *November Hearing*

■ The Bar alleges that the accused made three misrepresentations to the court at the November hearing. First, the Bar contends that the accused represented to the court that the alleged incident between Conner and Boxberger had occurred the weekend before the hearing, even though the accused knew from Vu's affidavit that the incident had occurred almost two weeks before the hearing.

By making the statements, quoted above, that there "was some action over the weekend" and that the situation had "just [come] up," the accused created the impression that the incident with the gun had occurred the weekend immediately before the November hearing. In fact, the evidence demonstrates that the only altercation between Conner and Boxberger involving a gun had occurred almost two weeks before that hearing. We are convinced that the accused knew that his statement was a misrepresentation, because the accused had prepared Vu's affidavit the same day as the *ex parte* hearing, and the affidavit stated that the incident had occurred on November 3. Moreover, the accused knew that his misstatement was material, because the accused knew that, to obtain a restraining order, he needed to convince the judge that there was an emergency. In the context of a hearing for a temporary restraining order, such a misstatement "could or would influence significantly [a judge's] decision-making process." *Benett*, 331 Or at 277.

Second, the Bar contends that the accused made a misrepresentation when he stated that "[t]here is no defense yet" in response to the judge's question whether the accused had told Conner or his lawyer that the accused was going to apply for an order. The accused admits that that statement displayed "a lack of candor." Also, at the time that he made the statement, he believed that Conner was represented by a lawyer. Moreover, the accused knew that his misrepresentation was material, because it is apparent that, in the context of a hearing for a temporary restraining order, a statement that the opposing party is not represented could influence the judge's decision whether to issue the order.[9]

---

[9] The Bar also contends that, after the judge had signed the injunction and temporary restraining order, the accused told the court that he would schedule a

In sum, we conclude that the Bar proved by clear and convincing evidence that the accused made two material misrepresentations of fact during the November hearing, in violation of DR 1-102(A)(3). The judge relied on the accused's misrepresentations, thus making them prejudicial to the administration of justice, in violation of DR 1-102(A)(4).

### 2. *January Hearing.*

The Bar contends that the accused made the following material false statements under oath at the January hearing by testifying that: (1) the judge who presided over the November hearing had not asked him if he had contacted Conner or Conner's lawyer; (2) he had not told the judge at the November hearing that the confrontation between Conner and Boxberger had occurred the weekend before the November hearing; (3) the judge at the November hearing had not told the accused that the accused needed to schedule a hearing immediately; and (4) the judge at the November hearing had not ordered Vu and Nguyen to post a bond in the amount of $1,000. The accused responds that his confusion at the January hearing, and his failure to recall accurately his exchange with the judge at the November hearing falls short of a "misrepresentation" under DR 1-102(A)(3). As noted, the trial panel found that the accused made a misrepresentation at the January hearing when he testified that the judge at the November hearing had not asked him if he had contacted Conner or Conner's lawyer.

As we have explained, the accused was under oath when he testified at the January hearing. Fowlks asked him, "Did [the judge] ask you if you contacted the defendant or his attorney prior to appearing ex parte?" The accused responded, "No." The accused did not testify, as he now claims, that he could not remember what the judge had asked him at the November hearing or that he needed to have his recollection refreshed. Rather, he testified that the judge had not asked him if he had notified the other side. Thereafter,

---

hearing immediately and that he failed to do so. However, as we have explained, Fowlks wrote to the accused the day after the November hearing stating that he would be filing a motion to set aside the order. The accused agreed to a prompt hearing on the matter. Neither side was able to appear until January 14, 2000. We agree with the trial panel that the accused did not make a misrepresentation regarding the scheduling of a hearing.

Fowlks played a tape recording of the November hearing. When confronted with what the judge had asked him about having contacted Conner or Conner's lawyer, the accused offered no explanation for his previous answer to Fowlks's question, such as claiming that he had been confused in answering Fowlks's question or otherwise should be excused for the misstatement. The accused knew that his false statement was material, because he knew that whether the accused had told the truth at the November hearing was relevant in determining whether the restraining order should be set aside. We conclude that the accused knowingly made a false statement under oath at the January hearing and that, in doing so, the accused violated DR 1-102(A)(3) and (4).[10]

■ Finally, we turn to the Bar's contention that the accused violated DR 7-110(B)(2) and (3), which provide:

> "In an adversary proceeding, a lawyer shall not communicate, or cause another to communicate, as to the merits of the cause with a judge or an official before whom the proceeding is pending except:
>
> "* * * * *
>
> "(2) In writing if the lawyer promptly delivers a copy of the writing to opposing counsel or to the adverse party if the adverse party is not represented by a lawyer;
>
> "(3) Orally upon adequate notice to opposing counsel or to the adverse party if the adverse party is not represented by a lawyer."

This court has explained that the purpose of DR 7-110(B) is to prevent the appearance or the effect of granting undue advantage to one party. *In re Smith*, 295 Or 755, 759, 670 P2d 1018 (1983).

The Bar argues that the accused was not entitled to deprive Conner or his lawyer of notice that he intended to appear *ex parte*, and that the accused communicated with the court on the merits of a cause when he presented the affidavit and proposed order to the court without providing copies of

---

[10] As noted, the Bar contends that the accused made three other false statements under oath at the January hearing. We agree with the trial panel that the Bar has failed to prove by clear and convincing evidence that the accused's other statements at the January hearing were false.

the documents to Conner or Fowlks. The accused concedes that he made a mistake when he relied on his domestic relations experience and failed to consult the applicable rules of civil procedure regarding notice and service before applying for the injunction and restraining order. In the accused's view, his mistaken assumption that he was not required to provide notice or to deliver a copy of his motion to the other side means that he did not act with a culpable mental state and, therefore, did not violate DR 7-110(B).

 We disagree with the accused that, because of his mistaken reliance on his understanding of domestic relations restraining orders in a matter involving a boundary dispute and his failure to consult the correct rules of procedure regarding notice before requesting the order, he did not violate DR 7-110(B). First, the accused, like everyone else, is presumed to know the law. *See In re Devers*, 328 Or 230, 241, 974 P2d 191 (1999) (so stating). Moreover, as we have explained, the purpose of DR 7-110(B) is to prevent the appearance or the effect of granting an undue advantage to one party. *Smith*, 295 Or at 759. The appearance or effect of undue advantage occurs regardless of the mental state of a lawyer who fails to comply with the requirements of the rule. Although, as we explain later in this opinion, an accused's mental state is relevant in assessing the appropriate sanction for a violation of that rule, a mistaken belief that the lawyer was not required to provide notice or service is not a defense to a charge under DR 7-110(B). *See Eadie*, 333 Or at 59 (holding misplaced reliance on statute to excuse service not defense to violation of DR 7-110(B)).

In this proceeding, the accused's only defense to the Bar's charge under DR 7-110(B) is that he did not intend to violate the rule. He concedes that he should have notified Conner or Fowlks before he requested the restraining order. We agree with the trial panel that the accused violated DR 7-110(B)(2) and (3) in the Vu matter.

In sum, we conclude that the Bar failed to prove by clear and convincing evidence its charges against the accused in the Mantow and Parrish matters. With respect to the Vu matter, we conclude that the Bar proved by clear and convincing evidence that the accused violated DR 1-102(A)(3),

DR 1-102(A)(4), and DR 7-110(B)(2) and (3). We turn to the question of the appropriate sanction.

As noted, the trial panel concluded that the accused should be suspended from the practice of law for nine months. The Bar argues for at least a nine-month suspension, while the accused believes that a public reprimand is the appropriate sanction.

## II. SANCTION

This court follows a well-established methodology to determine the appropriate sanction for disciplinary rule violations. *See In re Wittemyer*, 328 Or 448, 459-61, 980 P2d 148 (1999) (describing process for determining sanction after reviewing duty violated, mental state, injury, aggravating and mitigating circumstances, and court's case law). Consistent with that methodology, the court refers to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) and Oregon case law.

### A. *Duty Violated*

In violating DR 1-102(A)(3), DR 1-102(A)(4), and DR 7-110(B)(2)and (3), the accused violated his duties to the legal system and the legal profession. ABA Standards 6.0 and 7.0.

### B. *Mental State*

The Bar contends, and the trial panel found, that the accused acted negligently and knowingly. The accused contends that the evidence does not support a finding that the accused acted knowingly. "Negligence" is the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation. ABA Standards at 7. "Knowledge" is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective to achieve a particular result. *Id.*

With respect to the accused's failure to provide notice and service before appearing *ex parte* at the November hearing in the Vu matter, we conclude that the accused acted negligently. However, as we have explained above, the

accused's misrepresentations in the Vu matter were knowing. *See In re Kluge*, 332 Or 251, 255, 27 P3d 102 (2001) (to violate DR 1-102(A)(3) by misrepresentation, lawyer must know statement was false and material).

## C. *Injury Sustained*

"Actual injury" is harm to a client, the public, the legal system, or the profession that results from a lawyer's conduct. ABA Standards at 7. Potential as well as actual injury supports the imposition of a sanction. *In re Williams*, 314 Or 530, 547, 840 P2d 1280 (1992).

The accused's misconduct in the Vu matter caused actual injury. The parties stipulated that the judge who presided over the November hearing relied on the accused's statement of facts in deciding whether to issue a temporary injunction and restraining order. The accused's misconduct caused harm to Conner in that Conner was required to retain a lawyer to have the order set aside. The judge who presided over the January hearing was required to devote additional court time to setting aside an order that arguably would not have been issued had it not been for the accused's misconduct.

## D. *Preliminary Sanction*

If the only issue in this proceeding were the accused's negligent failure to provide notice to Conner or Fowlks in the Vu matter, then the ABA Standards suggest that a public reprimand would be the appropriate sanction. *See* ABA Standard 7.3 (reprimand generally appropriate when lawyer negligently engages in conduct that violates duty owed to profession and causes injury or potential injury to client, public, or legal system). However, because the accused's misconduct also involves misrepresentations and a false statement under oath, the ABA Standards suggest that disbarment or a suspension is the appropriate sanction. *See* ABA Standard 6.11 (disbarment generally appropriate when lawyer, with intent to deceive court, makes false statement and causes serious or potentially serious injury or potentially significant adverse effect on legal proceeding); ABA Standard 6.12 (suspension generally appropriate when lawyer knows false statements being submitted to court, takes no remedial

action, and causes injury or potentially adverse effect on legal proceeding). To determine the appropriate sanction here, we turn to aggravating and mitigating factors, then to this court's case law.

E. *Aggravating Factors*

The Bar argues that the accused's prior record of discipline is an aggravating factor. ABA Standard 9.22(a). It notes that, in *In re Dugger*, 299 Or 21, 697 P2d 973 (1985), this court held that the accused had violated *former* DR 1-102(A)(4) (1986), *renumbered as* DR 1-103(A)(3), for misrepresenting the initiation of court proceedings to his client and imposed a 63-day suspension. The accused responds that, under ABA Standard 9.32(m), the remoteness of the accused's prior misconduct "arguably is a mitigating factor."

██ ██ In evaluating an accused's prior record of discipline as an aggravating factor, this court considers the following factors: (1) the relative seriousness of the prior offense and resulting sanction; (2) the similarity of the prior offense to the offense at issue; (3) the number of prior offenses; (4) the relative recency of the prior offense; and (5) the timing of the current offense in relation to the prior offense and resulting sanction, specifically, whether the accused lawyer had been sanctioned for the prior offense before engaging in the offense in the proceeding at bar. *In re Jones*, 326 Or 195, 200, 951 P2d 149 (1997). Remoteness in time diminishes the significance of a prior offense as an aggravating factor, but does not function as a mitigating factor. *Id.* at n 4.

Having considered the relevant factors under *Jones*, we conclude that the accused's prior offense is entitled to some, but not considerable, weight. Other aggravating factors are that the accused has substantial experience in the practice of law, ABA Standard 9.22(i); there are multiple offenses, ABA Standard 9.22(d); and the accused does not appreciate the wrongfulness of his misconduct, ABA Standard 9.22(g).

F. *Mitigating Factors*

The sole mitigating factor is that the accused cooperated with disciplinary counsel and the local professional responsibility committee. ABA Standard 9.32(e).

## G. *Case Law*

We turn to a consideration of this court's case law. Recently, this court restated its long-held position that knowingly or intentionally making false statements under oath is among the most serious acts of misconduct that a lawyer can commit. *See In re Davenport*, 334 Or 298, 321-22, 49 P3d 91 (2002) (so stating and citing previous cases supporting that proposition). This court has imposed lengthy suspensions on lawyers who made false statements under oath. *See, e.g., In re Staar*, 324 Or 283, 924 P2d 308 (1996) (two-year suspension for knowingly making false statements of fact under oath plus other misconduct); *In re Sundstrom*, 250 Or 404, 409, 442 P2d 604 (1968) (five-year suspension for false testimony in Bar proceeding in addition to other misconduct).

This court also has imposed lengthy suspensions on lawyers for making misrepresentations to the court when the lawyer was not under oath, as the accused did at the November hearing. *See Gustafson*, 327 Or 636 (six-month suspension for knowingly making misrepresentation to court, in addition to other misconduct); *Claussen*, 322 Or 466 (12-month suspension for misrepresentation by omission to bankruptcy court, in addition to other misconduct); *In re McKee*, 316 Or 114, 849 P2d 509 (1993) (18-month suspension for misrepresenting to court that matter had been settled, in addition to other misconduct); *In re Hiller*, 298 Or 526, 694 P2d 540 (1985) (four-month suspension for single act of nondisclosure of material fact).

Having reviewed this court's case law, we conclude that a nine-month suspension from the practice of law is the appropriate sanction in this proceeding. As this court repeatedly has stated, testifying falsely under oath, as the accused did at the January hearing, is serious misconduct for which a lengthy suspension is required. Moreover, as we have found, the accused also made material misrepresentations of fact at the November hearing. The suspension we impose on the accused for the misconduct at issue in this proceeding is not as lengthy as we imposed in *Staar* or *Sundstrom*, but we conclude that the accused's misconduct was not as egregious as the misconduct in those cases. Under the circumstances of

this case, we conclude that a nine-month suspension will protect the public and the administration of justice. *See* ABA Standard 1.1 (purpose of lawyer discipline to protect public and administration of justice).

The accused is suspended from the practice of law for nine months, effective 60 days from the date of the filing of this decision.